DECECO CO. v. GEORGE E. GILCHRIST CO.

(Circuit Court of Appeals, First Circuit. September 29, 1903.)

No. 465.

**1. PATENTS—INFRINGEMENT—DEFENSE OF ANTICIPATION.**

That the device of a patent was in part anticipated by a foreign patent will not constitute a defense to a suit for infringement, where it contains a patentable improvement over the foreign device, and defendant has used the improvement.

**2. SAME—INVENTION—ELIMINATION OF PARTS.**

The mere simplification of a mechanical device, when of a substantial character, by the elimination of parts which have long been in use, and are expensive and burdensome in character, may amount to invention.

**3. SAME—INFRINGEMENT—WATER-CLOSETS.**

The Frame and Neff patent, No. 425,416, for a water-closet, discloses at least such an improvement upon the device of the Mann English patent, No. 577 of 1870, and that of the Buick patent, No. 383,038, as to amount to patentable invention. Claims 1, 3, and 4 considered, and *held* infringed.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

Frederick P. Fish and Marcus B. May, for appellant.

John R. Bennett, for appellee.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

PUTNAM, Circuit Judge. This is a bill in equity, based on an alleged infringement of the first, third, and fourth claims of letters patent No. 425,416, captioned for a "water-closet," issued to Robert Frame and Charles A. Neff under date of April 15, 1890, on an application filed on December 23, 1887. The Circuit Court dismissed the bill, and the complainant appealed.

¶ 2. See Patents, vol. 38, Cent. Dig. § 25.

The claims are as follows:

"(1) In a water-closet, the combination, with a bowl, of a siphon composed of an inverted-U-shaped pipe having communicating receiving and discharging limbs, the inner wall of the latter being provided with an integral abrupt projection for deflecting the water dropping thereon, said bowl being the only opening through which air or water is supplied, substantially as set forth.

"(2) In a water-closet, the combination, with a bowl, of a siphon composed of an inverted-U-shaped pipe having communicating receiving and discharging limbs, the inner wall of the latter being provided with an integral abrupt projection for deflecting the water dropping thereon, and an air channel leading from the top of the U-shaped pipe, one end opening into the bowl in a substantially vertical plane, substantially as set forth.

"(3) In a water-closet, the combination, with a bowl, of a siphon composed of an inverted-U-shaped pipe, the discharging limb of which is provided with a deflecting projection on its interior surface, substantially as set forth.

"(4) In a water-closet, the combination, with a bowl, of a siphon composed of an inverted-U-shaped pipe, the discharging limb of which is provided with a deflecting projection on its inner surface, said discharging limb being curved forward under the bowl, substantially as set forth."

The specification alleges that the patentees "invented a new and useful improvement in water-closets," which it states more particularly as follows:

"Our improvement relates to the construction of water-closets, urinals, slop-hoppers, etc., which hold water at a fixed level, being the level of a permanent overflow point, to be discharged on additional water entering the bowl, by siphonic action; and it consists of a new and improved device for inducing this siphonic action."

The specification also describes some incidental improvements, to which we need not refer.

It must be admitted that, for various reasons which it is not necessary to detail, siphonic action is regarded as the most useful method of operating water-closets; and it is, moreover, apparent that the long arm of the siphon, which is also the discharging limb of the bowl of the water-closet, must be free from all obstructions to a quick, full, and powerful vent. One other thing is apparent, namely: As is too commonly the case in patent litigation, the supposed state of the art is shown principally, if not entirely, by the introduction of prior patents. Nevertheless, enough can be gathered from what appears in the record to make it evident that a water-closet working successfully on the siphonic method, and yet of that compact construction which permits a convenient setting in place, and also diminishes the opportunity of those accidents, arising from continuous use, inherent in the complicated construction which the siphonic method is expected to minimize, had long been sought for in the practical art, but had not been thoroughly accomplished until by the ingenuity of the inventors to whom the patent in litigation was issued. It is also apparent that the device of Frame and Neff went into immediate and extensive use, and has ever since so continued, and that this arose not from merely fanciful and temporary causes, but by reason of intrinsic merit. Indeed, on the whole, the record fully sustains the presumption of patentability which arises from the issue of the patent, so that we have no occasion to examine any question except that of alleged anticipation by a British patent issued to John

R. Mann in 1870, No. 577, and by a United States patent issued to David D. Buick on May 15, 1888, No. 383,038.

The best method of approaching the question of alleged anticipation by Mann is to insert herein a copy of the complainant's exhibit, laying side by side diagrams of the respective devices. The dotted lines shown in this exhibit, and also the text, should be disregarded, as they are not found in the drawings attached to Mann's patent. Otherwise this exhibit reproduces each device with substantial accuracy, so far as this case is concerned:

While it cannot be denied that the Mann device was in fact operative on the siphonic method, yet it is entirely plain, both from the drawing and from the record, that Mann's closet was awkward, inconvenient, and perhaps impracticable for proper adjustment in ordinary plumb-

ing, and that it offered many points of developing weakness as the result of customary household use. Also it was probably too sluggish for satisfactory venting. Therefore it is easy to perceive why it was not adopted by the trade, as it was not, and easy to anticipate that it would not have been.

On the one hand, in Packard v. Lacing Stud Company, 70 Fed. 66, 67, 16 C. C. A. 639, we explained why, under some circumstances, a prior device cannot be rejected as an anticipation, although it has not been perfected into a practical and merchantable machine. On the other hand, the entire topic of inventive suggestions which have not been put into useful operation, including what is commonly known as "paper patents," is a difficult one, so that in each case a practical rule of judicial determination can rarely be worked out, except by a thorough and keen analysis of all the surrounding circumstances. Perhaps the matter has never been put more clearly than in the conclusion of a discussion as to the well-worn topic of who was entitled to the credit of the practical discovery or invention of the use of anæsthetics, found in Park's History of Medicine (2d Ed.) p. 312, as follows:

"Sir James Paget has summed up the respective claims of our four contestants in an article entitled 'Escape from Pain,' published in the Nineteenth Century for December, 1879. He says: 'While Long waited, and Wells turned back, and Jackson was thinking, and those to whom they had talked were neither acting nor thinking, Morton, the practical man, went to work, and worked resolutely. He gave ether successfully in severe surgical operations, he loudly proclaimed his deeds, and he compelled mankind to hear him.' As Dr. Morton's son, Dr. J. W. Morton, of New York, says, when writing of his father's claim: 'Men used steam to propel boats before Fulton, electricity to convey messages before Morse, vaccine virus to avert smallpox before Jenner, and ether to annul pain before Morton.'"

This contains a line of observation which is ordinarily just and practical, and which, if applied to the present case, would probably enable us to dispose of the alleged anticipation by Mann without further consideration. It is not now necessary, however, to go into this difficult topic.

The learned judge who decided this case in the Circuit Court apparently laid stress on the proposition that the respondent could not defend itself against a suit for infringement brought by Mann, provided Mann's patent were in vigor in this country. Even if this were true, and even if the complainant, also, were in a similar position with reference to Mann, it would not necessarily be decisive of this case. This litigation is not with Mann or with Mann's patent, but it is in favor of those who, in the most adverse view for them, have improved on Mann, so that, if the improvement amounts to invention, the respondent, if it has used the improvement, cannot shield itself behind Mann.

There may be, and there probably is, an underlying suggestion applicable to both Mann and the present inventors which is fundamental, and which was first put to use in this art by the former. We are lacking, in this case, any explanation of the operation of either device by any scientific person, capable of applying and making clear the laws of pneumatics and hydraulics, each of which sciences are

here involved in an occult manner. We are safe in assuming, however, that, when water falls through and out of a space wholly or partially confined, it takes with it a certain portion or the whole of the inclosed air, and leaves either an atmosphere more or less rarefied or a vacuum. Both Mann and the present inventors made use of this fact in connection with the vent of the bowl, which, for the present purposes, is the longer limb of the siphon, for the purpose of starting siphonic action. Mann found no method of accomplishing this, except by the multiplied zigzag which the exhibit repeated by us discloses. He does not state the principle of the operation; but, notwithstanding the claim made by respondent's counsel, which is partially, if not entirely, supported by the opinion of the learned judge in the Circuit Court, it is apparent that what he in fact devised was a completion of a confined space by the creation at the lower border of it of a water plug, caused by the crowding together by the zigzags of the rushing body of water which first came over from the bowl. The claim of the respondent is that, both in Mann's closet and in the closet in litigation, the confined space was completed partly by such clogging and partly by a film of spray. In the absence of the scientific explanation which we say is not in the record, we are unable to find this proposition proved; but it is not essential whether it is or not, so far as the present suit is concerned, although it might be in the supposed case of a suit brought by Mann against the present complainant. There can be little question that in Mann's closet the substantial element was the clogging or the water plug, though this may have been supplemented by a film or films of spray; but in the complainant's closet the film of spray was assumed by the inventors to be the substantial thing, and, if there be any water plug, it is only incidental. However, as we have said, none of these propositions, as to which, in the absence of proper scientific testimony, we can reach only probable conclusions, prove to be essential.

Frame and Neff, in their specification, say as follows:

"G is a restriction in the course of the discharging-limb for the deflection of water flowing through this limb. It may be a ring or rim, or it may consist of one or more projections on the same horizontal plane, or with one higher than the other. The upper surface or surfaces may be on a horizontal or an inclined plane."

Again, they say, as to the water descending through the discharging-limb, that "a part of it strikes upon the restriction, G, is deflected across its aperture, and forms a film or spray, which partially confines the contained air above it in the siphon." This "restriction, G," is what is described in claim 3 as "a deflecting projection." The respondent bases a criticism on the word "restriction" in the specification, although it does not run into the claim; but that such a criticism is not justified, and that the word "restriction" should not have been run into the claim, is clear from the fact that the extract we have made from the specification shows that, instead of a ring inside of the discharging-limb, one or more projections were supposed to be sufficient. It cannot be doubted that Frame and Neff had no conception of restricting the area of the discharging-limb with a view of producing a clogging or water plug, and it is also plain

that their conception was simply to create a film, without any such diminution of the area. Certainly, whether what they did resulted in merely a film, or partly in a film and partly in a clogging, they succeeded in their substantial conception, which was to produce rarefied atmosphere sufficient to induce siphonic action without obstruction to the full venting of the bowl, and with a combined quickly acting and full-discharging result. Not only did they simplify what Mann produced, but they simplified it to a substantial extent, and in such way as to render practicable a compact construction, suitable for modern plumbing. They produced a quicker siphonic action, because it is plain that the film of spray, or whatever resulted from the flowing water impinging upon a rim or projection, would be immediate, while they left an unobstructed vent in the discharging-limb of the bowl. Thus they not only acccomplished simplification, but, with that, they produced such improved results as converted the Mann device from an unmechanical closet, unsuitable for modern plumbing, sluggish, and not a practical success, to one compact, adapted to modern plumbing, quick, and free in its action, and apparently in all respects satisfactory to the trade.

As we have already indicated, it is not impossible that Frame and Neff introduced an entirely new method of action, which might perhaps be called a process, by substituting a film instead of a water plug as a substantial element, and that they thus so differed from Mann that he did not anticipate them, and that they could not be said to infringe, if, as supposed by the Circuit Court, his patent were in full vigor in the United States when theirs was applied for. But as we have already said, in the absence of scientific proofs throwing clear light on these propositions, we think it suitable to support more fully the view which we have suggested, that what Frame and Neff did was, in any event, an improvement on Mann, of such a character as to rise to invention, and therefore sufficient in the present litigation. It cannot be denied that a mere simplification of a very substantial character, disposing of parts which have long been in use, expensive and burdensome in their nature, and which the trade has found no method of dispensing with, may amount to patentable invention. To obtain absolute simplicity is the highest trait of genius. Hobbs Manufacturing Company v. Gooding, 111 Fed. 403, 406, 49 C. C. A. 414.

In Richards v. Chase Elevator Company, 159 U. S. 477, 486, 16 Sup. Ct. 53, 40 L. Ed. 225, the opinion in behalf of the court says that the omission of an element in a combination may constitute invention, if the result of the new combination be the same as before. The context shows that this conditional qualification was intended to indicate that the result should be at least as effective as before. In that particular case it appeared that the omission of the element referred to was attended by a corresponding omission in the functions of the device. It was also held, at page 487, 159 U. S., page 54, 16 Sup. Ct., 40 L. Ed. 225, that the entire combination was a mere aggregation, so that in any event there was no invention. In National Company v. Hedden, 148 U. S. 482, 489, 13 Sup. Ct. 680, 37 L. Ed. 529, it was held that the omission of a feed roll did not, in

that particular case, involve invention, in view of the fact that the same function had been accomplished previously, although not so perfectly, and although it was said on page 490, 148 U. S., page 684, 13 Sup. Ct., 37 L. Ed. 529, that the new machine was capable of doing more work, and at less expense. Like all cases involving the question of invention, these turn on their special circumstances. Lawther v. Hamilton, 124 U. S. 1, 6, 8 Sup. Ct. 342, 31 L. Ed. 325, related to a patent which was accepted as one for a process. It might as well have been taken out for a machine, but, however this may be, so far as the question we now have before us is concerned, it is unimportant whether for a process or for a machine. There is the only claimed invention was the omission of certain muller stones in a machine for obtaining the oil from flax seed. The court held that this was a "real improvement." It went further, and held that the result was a new process. Either view of that case—that is to say, that the omission of the muller stones was a mere improvement, or that it resulted in a new process—fits either view of the case before us. The decision is explained in Crescent Brewing Company v. Gottfried, 128 U. S. 158, 167, 9 Sup. Ct. 83, 32 L. Ed. 390, where it was distinguished from the case then before the court, on the ground that the omission of the muller stones produced more oil and better oil cake; that is to say, there was not only a simplification of the mechanism, but a better result. It is entirely plain in each aspect, for the reasons we have stated, that in these particulars the case at bar is stronger in behalf of the complainant than was Lawther v. Hamilton. It certainly contains marked elements which are not found in Richards v. Chase Elevator Company, nor in National Company v. Hedden. Here we not only have simplicity, but a result which first produced a satisfactory, practical water-closet, operating on the underlying principle common to Mann, on the one side, and to Frame and Neff, on the other, and this result accomplished by what was clearly marked ingenuity.

This leaves us to consider the alleged Buick anticipation, which is apparently easily disposed of. If Mann made use of a water plug, instead of the spray claimed by Frame and Neff, so much the more did Buick. In his specification, referring to the drawings, he says that a certain number represents a contraction in the delivery pipe of the bowl, by which its area is reduced; and he adds, "In practice, I reduce the diameter of a four-inch pipe to about two inches, leaving the pipe full size above and below." He also says: "The rush of the water practically seals the contracted part, even if the area of said part be greater than the combined areas" of the inflow pipes, "so that no air can pass up," and the contents of the bowl are siphoned out. Reducing the diameter of a four-inch pipe to about two inches diminishes the efflux three-fourths. This probably obstructed "the rush of the water" even more than Mann did. There is a serious contest over the question whether Buick did, in time, precede Frame and Neff; but we need not trouble ourselves with that, because it is thus made plain that he was proceeding on the principle on which Mann proceeded, and had some of Mann's essential faults in an aggravated form. So that, although he testified that his closet

gave satisfaction wherever it was used, yet it is apparent that it was never adopted to any considerable extent, and long ago ceased to be on the market. It is enough to say that Frame and Neff improved on both Mann and Buick, even if in a slightly different manner as to each.

The substance of Frame and Neff's invention is covered by claim 3. This claim introduces no unnecessary element to embarrass the court in considering the question of infringement. Therefore in touching on that question we limit ourselves to it.

An inspection of respondent's closet shows clearly that it is so merely a colorable imitation of Frame and Neff as to need no discussion. The fact that it is an infringement follows by necessary implication from the testimony of respondent's expert. He starts with an erroneous criticism, based on the word "restriction," which we have already considered. Proceeding from that, he classes Frame and Neff with Mann, stating that their device now in suit "will positively choke the discharging-limb by restricting its cross-area." We have shown that, in the particular of restriction, Frame and Neff differed from both Mann and Buick, and therefore respondent's expert is mistaken in his premises. He then proceeds, "It is evident that the defendant's closet does not have any such restriction, nor any projection on the interior surface of the discharging-limb, but, on the contrary, has the same area throughout its entire length." It is the "same area" in the same way only that Frame and Neff have the "same area" throughout the entire length of the discharging-limb. It has the projection of Frame and Neff, although in a colorable form; and it operates in the same simple way as Frame and Neff, and secures the same result, whether Frame and Neff produce only a spray, or produce a spray with an incidental choking of water. Rejecting, therefore, the premises with which this expert begins, and whatever he has introduced that is clearly erroneous, the result is that he indirectly shows that the two devices before us are practically the same, and produce the same substantial result. But, indeed, without this testimony, it is, as we have already said, too palpable from a mere inspection that the respondent built with the complainant before its eyes to need even what we have said on this topic.

Claim 1 and claim 4 differ from claim 3 in merely nonessential matters. While, according to strict rules of law, two distinct claims for the same substantial matter, differing only in nonessentials, cannot both be sustained, yet, out of regard to the frailty of human methods of expression, and the variety of views among different legal judicial tribunals as to the construction of instruments of the character of letters patent, and conceding, also, the difficulty of always correctly defining what one's invention really is, the practice has become settled to allow the same substantial invention to be stated in different ways, very much as the same cause of action, or the same offense intended to be covered by indictment, are permitted to be propounded in different counts, with a general verdict on all of them.

The decree of the Circuit Court is reversed; the case is remanded to that court, with directions to enter a judgment for the complainant below; and the appellant recovers its costs of appeal.