**BALDWIN–SOUTHWARK CORPORATION v. TINIUS OLSEN TESTING MACH. CO. et al.**

No. 6074.

Circuit Court of Appeals, Third Circuit.

Feb. 13, 1937.

Rehearing Denied April 2, 1937.

Clifton V. Edwards, of New York City, and Edward A. Hathaway, of Philadelphia, Pa. (Morgan, Lewis & Bockius, of Philadelphia, Pa., of counsel), for appellant.

Robert M. Barr and Leon Edelson, both of Philadelphia, Pa., for appellees.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

This patent case concerns machines for ascertaining and recording the breaking point of, for example, concrete under compression and steel under tension. As stated by the court below: "Testing machines have to deal with tremendous forces but they must measure them with the highest degree of precision. The crushing of a block of cement or the breaking of a bar of steel requires a powerful and rugged machine, but unless it can register with exactness the breaking point it will be of little value in modern engineering practice."

In such machines the breaking force, known as the "load force," is exerted against the article to be tested, and such "load force" is a great one. For example, the proof in reference to a testing machine in the National Bureau of Standards at Washington is: "This machine is for testing specimens in either tension or compression and has a capacity in tension of 1,150,000 lb. on specimens of any length up to 34 ft. 4 in. after straining, and a capacity in compression of 2,300,000 lb. on specimens of any length up to 33 ft. 1-¾ in. between platforms 36 in. in diameter." And machines made by the defendant "for slab and long column tests" are described as adapted to tests up to 10,000,000 pounds.

Such being the conditions which confront a testing machine, it has been found that it is impracticable to balance millions of "load force" pounds against millions of specimen pounds, and the art resorted to using instrumentalities located between the "load force" and the ascertaining and recording mechanism, whereby a lesser force than the actual "load force," but proportionate thereto, could be exerted on the ascertaining and recording measuring mechanism. In accord therewith it was customary, roughly speaking, in the graduated beam or lever and counterweight in weigh scales, to use levers, to one end of which the "load force" is applied and at the other a counter balance weight, movable by hand.

In his handbook on the art (published in 1899), Professor Adolph Martens, director of the Royal Testing Laboratories of Berlin and at Charlottenburg, says: "The same principles which apply to scales, gauges, etc., also apply to the load-indicators of testing-machines. There are some additional special features which have individually been adopted more or less generally in testing-machines. The scale, especially the beam-scale, is frequently such a predominant feature in the design of the testing-machine, that it becomes apparent at the first glance in the modern machine."

Indeed, that the lever type machine was the prevalent one in use, is shown by defendants' catalogue, where, referring to the accompanying picture, in which will be seen the graduated lever weight beam and the movable counter, the defendant says:

"The above illustration is of our 100,-000, 150,000 and 200,000 pounds capacity Olsen New Automatic and Autographic Universal three-screw type motor-driven Testing Machine as used by all up-to-date testing laboratories throughout this country and abroad. * * *

"These testing machines are the recognized standard for high-grade testing throughout the world. They excel in accuracy and sensitiveness, are designed for maximum strength, durability, and ease in operation."

Incident to the operation of a lever, and necessarily so, a "knife edge" was required, and this resulted in inaccuracy. The testimony introduced by defendant shows this. Its Exhibit 5, Yale and Towne Bulletin, says:

"The corner-stone of all existing systems of weighing machines is the 'knife-edge'. This consists usually of a triangular piece of hardened steel, resting on a flat plate of the same material, and forms the fulcrum on which the scale beam or lever oscillates."

"Theoretically, the knife-edge rests and oscillates upon a mathematical line, and the more nearly practice conforms to theory in this respect, the more accurate will be the scale. In practice, however, and particularly in large scales, the knife-edge is required to support heavy loads, and its bearing surface must thus have a sensible area to prevent the crushing of the material. This is sought by increasing the length of the knife-edge, the usual rule being to limit the pressure to a maximum of 12,000 lbs. per inch of length. As a result the knife-edges in large scales have considerable length, and this fact introduces another element of error, viz., the difficulty of fixing the knife edge in absolute parallelism with the axis of rotation of the beam or lever, and of preventing flexure of the knife-edge under pressure, so that it does not bear uniformly on the whole of its length. Obviously the least want of coincidence in either of these respects would introduce a large and variable element of error. Even assuming a knife-edge to be originally true in all respects, its bearing surface brought to a perfect and sharp edge, its axis exactly normal to the plane in which the beam vibrates, and the two plates on which the ends of the knife-edge rest to be true planes and perfectly aligned, how long is it probable that all of these conditions can be maintained? Oxidation tends always to disturb them; the pressure and shock due to heavy loads is a still greater cause of variation; and any disturbance in the frame or setting of the machine may also introduce error. All of these causes of disturbance are constantly at work in most cases, and as a result the sensitiveness and accuracy of such scales constantly deteriorates."

Quoting further from such exhibit, we find this statement of the Howe Scale Company:

"It is self-evident that the less number of knife-edge bearings the less the friction, and the more sensitive will be the scale.

"All the main parts of the tract scale are almost indestructible, but the vital parts are the knife-edges. These are the delicate sensitive parts, and are subject to wear. When worn, the scale becomes dull, and more weight has to be placed on the platform to affect the beam than when first built."

The art, though recognizing for a long period the objectionable features of levers in testing machines, found no satisfactory way of eliminating them. And the desirability of doing so became all the more apparent when the Bourdon measuring and recording device came into use. It was an accurate recorder which in no way affected the other parts of a measuring machine or the operation there-

of, it being acted upon by the other elements. It consisted of a coiled metal tube of elastic character, one end of which was fixed in position and the other end free. When oil, which is incompressible, is forced into it, the free end uncoils in proportion to the amount of forced in oil. That the possibility of doing away with the levers and the use of Bourdon's device was a possibility is shown by the statements of Professor Martens in 1899, quoted below, but it is equally true that he did not solve it or pretend to have solved it, and that the elder Emery also did not solve it[1], and that, if solved, Bourdon's tubes could not be used in the device of Emery. And it further appears that though Martens called the possibility of an improvement to the attention of manufacturers, his suggestion "remained fruitless." Emery, Sr., the father of the present patentee, in his patent No. 918,488, granted April 13, 1909, for a testing machine, made some changes and avoided the use of levers as reducing means, and - while he eliminates the knife blade, he still retained levers as an agency in measuring. His machine made no use of the Bourdon indicator, and the proof is that the cost of his machine and its impractical character were such that but twenty-five of them were sold in fifty years and that its manufacture was tried and dropped by competent manufacturers, showing that it really solved no practical difficulties in the art and commercially was a failure.

In this regard, Emery, Jr., who was associated with his father, testified, and there is no contradiction: "As to whether the old hydraulic support machine, as developed, perfected and placed in operation by my father, was commercially successful, depends on what you mean by commercially successful. As I intimated, it was a mechanical and an engineering success, but it was never anything that could be considered a basis of a permanent business. Yale and Towne took it and had to drop it. Sellers took it and had to drop it. Mr. Emery took it back and it practically had to be dropped."

In this moribund and long-continued stationary state of the art, Emery, Jr., obtained his patent No. 1,848,468, issued March 8, 1932, for a machine for testing the strength of materials. Without sales agencies, means, or methods, the machine worked its way into public favor. Seventy-five per cent. of the testing machines of 60,000 pounds capacity embody the patent, and the price of the Emery, Jr., 60,000-pound machine is $9,-800, as compared with the $50,000 price of the Emery, Sr., machine. Indeed, as the court below stated: "It may be assumed that the machine constructed under the patent accomplished its purpose in a satisfactory manner. The measure of commercial success which it attained is a good indication that it did."

The device of Emery, Jr., was so novel, his machine so different from his father's patented device, that the father scoffed at it and far from his regarding his own patent as anticipating and embodying his son's device, he declared the principles used by the son were different from his own and that to embody them in his machine would be destructive.

Now it may be assumed that Emery, Sr., knew what his own patent invention was better than third parties, and when it was suggested he could embody the Bourdon indicator in his device, he scoffed at the idea. The witness Tate, who was an officer of the Emery Company, testified:

"Q. Was it ever suggested in the days of the early Emery machines to use a Bourdon tube with the machine to measure the pressure? A. I think that it was some time between 1912 and 1915 that I asked Mr. Emery Sr. whether or not it would be possible to use a Bourdon gauge for indication in the Emery machine.

[1] "a. From the previous Sections 554–559 and the success of the Emery machines, it will be seen that the use of hydraulic reduction by differential chambers offers material advantages, because very simple and compact machines can undoubtedly be thus constructed, especially if it should succeed to use them in connection with simple spring-gauges. I have been personally busy with this idea for years, without having been able to perfect it, because of preoccupation.

As my frequent propositions to manufacturers remained fruitless, I desire to publish them in this place. I am convinced that it will be possible to build reliable machines, having an error less than 1%, based on the principle of hydraulic chambers, for there is no reason to assume that, with proper construction and use under moderate loads, hollow springs (Bourdon tubes) will not work as reliably as spiral springs in the indicator."

"Q. Did he think that this idea was feasible? A. He scoffed at it, saying that it was directly opposed to the underlying principle of the Hydraulic support."

This brings us to the question, What did Emery, Jr., do? Now the proof is that machines of the type of the Emery, Sr., patent were not a commercial success. This was so because of their bulk of material, 200,000 pounds, and their cost, $50,000. In that regard, and of what Emery, Jr., sought to do by his patent, the court below said:

"What the patent was really intended to accomplish was stated very clearly by him (Emery) in the course of his testimony. He said: 'The old machine (referring to a type manufactured by his father) was very heavy, very large and all its parts were very massive * * * It then became evident that if we were going to stay in the testing machine business and sell a machine of the Emery principle of using one hydraulic system for a power system and a second hydraulic system for measuring the load on the specimen that the machine would have to be greatly simplified, greatly reduced in weight, and greatly reduced in cost, in order to enter the commercial field. Working with that end in view, we or I, devised the machine shown in the patent.'

"That was the main purpose. The other object was to get a machine which could safely use a Bourdon gauge."

As to the desirability of a testing machine being adapted to use the Bourdon gauge, it will be observed that the Bourdon gauge was automatic and was actuated by the "load force" and instantly and continuously ascertained, measured and recorded the "load force" at every step of increasing "load force."

This being done automatically, a measuring machine using it could be operated by unskilled labor and by its nonuse of the lever it eliminated "knife edge" construction and inertia weights. On the other hand, a machine of the lever type had to be operated by a skilled man and the measure of the "load force" and the progressive states leading to the breaking point were not ascertainable or observable until the "load force" reached the breaking point.

Now, without entering into details, it is clear that Emery, Jr., completely did away with levers and their cumbersome weight, their knife-edge requirement, their inertia, and the tardiness of their recording, coupled with high cost incident to the massive amount of material required in such a construction. While Emery, Sr., used a "hydraulic support" and avoided the use of objectionable knife blade edges, so far as stepping down reducing was concerned, he did not wholly eliminate the structural and functional objection incident to a lever measuring system, which Emery, Sr.'s, device was, and which, as we have seen, in his view, could not be adapted to the use of the Bourdon device. From which it will be seen that to permit the use of this highly desirable recording device, if Emery, Jr., was to use his father's device, he had to radically adapt to new relations the hydraulic support system of his father. This he did, with the result, as we see it, that he produced a device which for reducing and measuring purposes dispensed with lever use and with the additional function of enabling the art to use the Bourdon tube with a spring balance measuring function.

As we have noted above, the Bourdon device is a measuring and indicating device whose function is to measure the "load force," but not in any way to affect it. In the claims here in question it is not an element. But a practical result of Emery, Jr.'s, handling in combining the different elements of the structure for the first time permitted in a non-lever, hydraulic supporting device the use of the Bourdon gauge for quickly measuring, and instantly showing, and accurately recording the approaching breaking point of material both in compression and in tension.

In that connection we note the uncontradicted proof in reference to the significant difference between lever and nonlever use.

"Also, there is noted a phenomenon due to molecular structure wherein the load goes through a series of jumps at the yield point, where the material is changing structure. Those are all indicated. The exact point of change of rate of loading appears, and all of the jumps in the test appear, the exact ultimate strength and the exact breaking point is obtained, whereas due to the inertia of the heavy beam machine the two points that were found were the drop of beam, as they call it, or the approximate

yield point, and the ultimate strength, which was the highest strength obtained. It was impossible to follow the quick change of load."

■ Its rapid and widespread adoption evidences its value. Its recognized novelty, its handling of ponderous substances by comparatively light, simple, and relatively inexpensive agencies, its original and inventive character are all shown by the facts that in an art of high engineering character it was the first device to disclose in combination a device adapted to embody a simple machine, use a hydraulic support to reduce the "load force," and to use such reduced force to operate a spring gauge measuring automatic device. Indeed, the simplicity of a device, instead of minimizing its inventive character, may be an evidence of invention. In that regard this court, in Aronson v. Toy Devices, Inc., 1 F.(2d) 91, 92, said: "Mere simplification of a substantial character, disposing of parts which have long been in use, may amount to invention. 'To obtain simplicity is the highest trait of genius.' Hobbs Manufacturing Co. v. Gooding et al., 111 F. 403, 406, 49 C.C.A. 414; Dececo Co. v. Gilchrist Co., 125 F. 293, 60 C.C.A. 207; Brown v. Huntington Piano Co., 134 F. 735, 67 C.C.A. 639. While Aronson's patents are not pioneer, we think that his simplification of the prior complicated devices into a useful, practical, commercial device amounts to invention."

Indeed, these facts so strongly impressed the court below as to lead it to this tribute to the patentee's device: "He undoubtedly produced a machine of superior design from an engineering and a commercial standpoint. He was able to market it successfully in competition with older types, although it is probable that the fact that the indicator was a Bourdon gauge, requiring no management, such as the lever system called for, and consequently making the whole machine easier to handle, had more than a little to do with this."

■ Seeing then that Emery, Jr.'s, device was novel, useful, and inventive and that the claims here in issue were properly granted, it is, however, contended his device was anticipated. Now this court has consistently stated the anticipation requirements necessary to invalidate a patent. In Allen v. Wingerter, 17 F. (2d) 745, we said: "We discern in the apparatus of the patent several old elements of the art, yet when assembled the apparatus became an entity which physically, functionally, and in the result attained was new and useful beyond comparison with anything that had gone before. Nothing in the prior practical art anticipates it. Nor do we think it is anticipated by the prior patented art, the principal patents now relied on having been references made by the Patent Office in the prosecution of the patent application. Though containing old elements, the device, when regarded as a whole, is new and very useful and shows invention in its structure. Thropp & Sons v. De Laski & Thropp Circular Woven Tire Co. (C. C.A.) 226 F. 941, 947."

In Craft-Stone, Inc., v. Zenitherm Co., 22 F.(2d) 401, 402, we held: "The patentee invented a new and useful product, and it is not permissible for an infringer to go to the prior art and defeat the patent by selecting the various elements of the patentee's process from different patents, bring them together, and say that this aggregation anticipates."

And in Hartford-Empire Co. v. Hazel-Atlas Glass Co., 59 F.(2d) 399, 413, we added: "Where an art, eager for relief, found in these moribund patents nothing to meet that suggested solution, it is safer to rely evidentially on the then judgment, attitude, and conduct of the glass trade rather than on the post litem testimony of experts, the contentions of infringers, and the theoretical construction that often tempts courts to create out of lifeless patents an imaginary machine on paper which a working art could not do in steel."

Measured by these standards, we find no such combination device as Emery, Jr.'s, was shown in the eighteen alleged anticipating patents, nor do we think that the plain purpose of the claims here in issue can be minimized in scope by the proceedings in the patent office. Throughout the proceedings, these claims were contended for in unchanged form and were eventually allowed.

It remains to consider the question of infringement, as to which, in view of the length of our opinion and the discussion of the art, we now briefly state our views. The defendants, a long time and extensive maker of testing machines, always have used the lever type, until the requirements of the New York State Highway

Department constrained it to substitute for its proposed lever machine a nonlever machine of the general type of the nonlever machines of the Emery, Jr., type. Of it we find ourselves—not to mention other points of resemblance—in accord with the plaintiff's contention, namely: "The defendants' machine differs from that of the plaintiff only in minor details. For example, the gooseneck, instead of having one upright, has two uprights. The supporting springs, instead of surrounding the side rods, surround two rods parallel with and rigidly connected with the side arms. These slight deviations, however, do not result in any difference in function or mode of operation between the machine of the patent in suit and that of defendants. The simplicity, accuracy and ability to operate with a Bourdon tube type of gauge, attained by the patent in suit, are copied in defendants' machine."

So holding, the decree of the court below dismissing the bill is vacated and the record is remanded, with instructions to enter a decree adjudging the claim of the patent in issue valid and infringed and ordering an accounting.