EASTERN PAPER BAG CO. v. CONTINENTAL PAPER BAG CO.

(Circuit Court, D. Maine.   October 9, 1905.)

No. 546.

1. PATENTS—SUIT FOR INFRINGEMENT—JURISDICTION OF EQUITY.

Quære, whether a suit in equity may be maintained for an injunction to restrain infringement of a patent, as well as for an accounting, although the owner of the patent has never constructed a machine thereunder for practical use, and apparently does not intend to do so, but merely to hold the patent to prevent the use of the invention by competitors in business.

2. SAME—INVENTION.

Invention may exist in substituting a new and different operating part in a machine, notwithstanding it does not constitute such an advance in the art as to lead the owner of the patent to discard old machines and use those of the patent. It may be enough that the substitution addresses itself to any considerable portion of the community and creates an opportunity for electing between different methods.

3. SAME—CONSTRUCTION OF CLAIMS—LIMITATION BY SPECIFICATION.

The rule applied that where the claims of a patent for a machine refer generally to "means" for accomplishing a specified result or movement, without claiming such means, they are not limited by a description of particular means in the specification, given for the purpose of explaining the mode in which the patentee contemplates applying the principle of his invention, as required by Rev. St. § 4888 [U. S. Comp. St. 1901, p. 3383].

4. SAME—DEFENSE OF INVALIDITY—MEASURE OF PROOF.

The rule applied that defenses which impugn the legality of a patent, issued with apparent regularity, must be supported at least by proofs which are satisfactory to the court, and cannot be established by a mere preponderance of the evidence, and this to the extent of requiring the proof to be clear, unequivocal, and convincing, where fraud and criminal acts in the procurement of the patent are charged.

5. SAME—VALIDITY—MECHANISM SUPPLIED BY ANOTHER THAN THE PATENTEE.

The fact that another than the patentee contributed to the mechanism necessary to make the invention operative does not affect the validity of any claims of the patent which do not cover the mechanism so supplied, either as a whole or in combination.

6. SAME—SUIT FOR INFRINGEMENT—DEFENSES.

It is not open to an alleged infringer to collaterally attack a patent on the ground of fraud in its procurement, as that the patentee's solicitor contributed a substantial part of the invention and embodied it in the application after the patentee had made oath to the same.

7. SAME—PRIORITY OF INVENTION.

The rule applied that where two inventors are working contemporaneously, but independently, on the same invention, the one who first reduces his ideas to a definite form by means of a written description, model, or drawing, and obtains a patent therefor, is entitled to priority.

8. SAME.

Evidence considered, and held insufficient to overcome the presumption of priority of invention in favor of the Liddell patent, No. 558,969, for a paper bag machine over the Claussen patent, No. 598,497, for which application was made after the issuance of the Liddell patent.

9. SAME—INFRINGEMENT—PAPER BAG MACHINES.

The Liddell patent, No. 558,969, claims 1, 2, and 7 for a paper bag machine, the essential feature of which is the use of a rotating cylinder, instead of a reciprocating carrier, as the bed on which the folding is performed, in combination with a forming plate oscillating on its rear edge on the surface of the cylinder, were not anticipated nor narrowed by anything in the prior art, and they disclose patentable invention. Also, held infringed by the machine of the Claussen patent, No. 598,497.

In Equity.   On final hearing.

The following represents the draft as amended in pencil before January 7, 1896, when read, with the pen additions, and without the words canceled or italicized:

## UNITED STATES PATENT OFFICE.

William Liddell, of Brooklyn, New York, Assignor to the Eastern Paper Bag Company, of Connecticut.

### Paper-Bag Machine.

Specification forming part of letters patent, No. 558,969, dated April 28, 1896. Application filed February 6, 1896.   Serial No. 578,291.   (No model.)

To all whom it may concern:

Be it known that I, WILLIAM LIDDELL, of the city of Brooklyn, county of Kings, State of New York, have invented an Improvement in Paper-Bag Machines, of which the following is a specification.

My invention has reference to paper-bag machines; and it consists of certain improvements which are fully described in the following specification and are shown in the accompanying drawings, which form a part thereof.

This application comprehends certain mechanism for forming a satchel bottom upon the tube in the manufacture of paper bags, and has for its object the production of a perfectly-formed satchel-bottom bag in a speedy and accurate manner.   My improvements, briefly stated, may be described as follows: The tube is received upon a revolving cylinder and carried forward by a nipper, which clamps the lower sheet of the tube, *or by other means hereinafter described.*   The upper sheet of the tube passes above a finger upon a movable forming-plate securely held at a short distance from the revolving cylinder and between which and the cylinder the tube is guided.   The forming-plate is then caused to rotate about its rear edge simultaneously with its movement or travel with the revolving cylinder, thereby opening the end of the tube, spreading the side folds, and marking a creased line transversely.   Simultaneously with this forming-fingers are projected into the side folds, one pair being adapted to the cylinder and the other pair to the forming-plate.   A continued movement of the parts causes the upper layer or sheet of the tube to be completely turned backward upon itself, and at the same time the forming-fingers together with the other parts insure the proper formation of the diamond fold.   The tube in this shape leaves the revolving cylinder, passes to the pasting devices, and thence to the folder.

The invention will be better understood by reference to the accompanying drawings, in which—

Figure 1 is a side elevation of a paper-bag machine embodying my improvements.   Fig. 2 is a plan view of a portion of the same.   Figs. 3 and 4 are sectional elevations on the line *x* *x* of Fig. 2, showing the operations of the parts in the formation of the bottom.   Figs. 5, 6, 7, and 8 are perspective views illustrating the several manipulations which take place upon the bag-tube in its formation under the action of the nipper and the forming-fingers.   *Fig. 9 is a diagram illustrating the employment of a continuous or connected series of tubes to insure their being fed with the cylinder and obviating the necessity of nippers.   Fig. 10 is a plan view of the paper tube employed in connection with Fig. 9.   Fig. 11 is an inverted plan view of same, and Fig. 12 is a longitudinal section of the tube on line z z.*

A is the main frame of the machine.

B is a shaft carried upon the main frame and upon which is supported the forming-cylinder C, which may be provided with one or more nippers $c$, adapted to be closed and held by the action of the spring $c'$, and opened by the action of a pin $C^2$, acting upon the star-wheel $C'$.   The nipper is also controlled as to its being closed by the action of the pin $C^3$, also acting upon the star-wheel.   These devices operate to enable the nipper to close upon the forward edge of the under layer of the bag-tube, and after the formation or creasing of the bottom into the diamond folds to release the bag-tube.

D D are two feed or guide rollers adapted to properly deliver the bag to the cylinder C.

E is a forming-plate and is hinged at $e$ to the arm F, journaled to the main frame at $f$. This arm F is drawn toward the cylinder C by a spring F", and is moved away from the cylinder about the axis $f$ by ~~cam K' and arm F'~~ *gear K*,

L is a rotating power-shaft *carrying cam* and is driven by a belt-pulley L' and operates the cylinder C by gears $M^2$ $M^3$. Spur-gears M' M N operate the axis $e$ of the forming-plate E when the arm F is moved. Of these gears M' is substantially fixed, and hence when the arm F is moved its gears M work upon gear M' as if it were a rack. This causes motion to the plate E about $e$ as an axis.

*As the motion of the arm F is irregular and not always in the same direction for one continuous movement of the former-plate E, I cause the gear M' to be moved somewhat to compensate for this. On the shaft L, I arrange a cam K, which acts upon a rod $k$ to reciprocate it, and this by link $k^2$ rocks the gear or rack M'. The cams K and K insure a proper return movement of the arm F and former-plate E, and in time with the rotations of the cylinder C. In place of these devices for controlling the movement of the plate E relatively to the cylinder C the said plate may be moved or operated by any other suitable means. The return movement of the plate E is unimportant, so long as it is secured in time to receive a new bag-tube or section thereof.*

The cylinder C has pivoted upon its periphery fingers G G, which are normally out of the line of the bag-tube, but which may be projected inwardly by the action of a cam I', secured to the main frame A. The fingers G G are connected together by arms $g$ and a link G', arranged in the under side of the cylinder-surface, and one of them is further provided with an arm $G^2$, adapted to come in contact with the cam I' during the rotation of the cylinder and thus cause said fingers to be projected inward, as indicated in dotted lines in Fig. 2, so as to enter the bellows side folds of the tube. The former-plate E has its rear edge made sharp, as at W, so that when it presses downward upon the bag-tube it forms a transverse crease about which the paper bends, as clearly shown in Figs. 4 and 6. This former-plate E is also provided with fingers H H, corresponding to the fingers G G, which are connected by arms $h$ and link H' precisely as are connected the fingers G G, and are operated by means of a spring J in one direction to hold them out of action, and a stationary cam I, acting upon an arm or projection $H^2$, to move them inward or in the other direction, so that they enter the bellows side folds precisely as at the fingers G G. Stops J' limit their movement in one direction.

The rear or free end of the former-plate E is provided with eyes $E^2$, which are received upon projections A', as clearly shown in Fig. 3, so as to be maintained out of the line of the bag-tube in entering between the said plate and the cylinder C after it has been caught by the nipper $c$ and moved forward. When the bag-tube is moved to the position shown in Fig. 3, the upper layer of the paper is moved over a finger E", arranged adjacent to the axis $e$ and below the former-plate E. As the plate E is moved forward with the bag-tube the eye $E^2$ leaves the projection A', as shown in Fig. 4, and the edge W presses down upon the paper, forming a line or crease. It will also be observed that as this takes place the fingers G H upon each side at their free ends are brought more or less together, and at the same time the finger E" moves away from the nipper $c$, opening the bellows side folds, as indicated in Fig. 4. This permits the ready entrance of the fingers G H under the action of the cams I' I, and these fingers continue to maintain their position during the successive formative actions of the machine. As the cylinder C moves forward the plate E rotates upon its own axis $e$ and also about edge W as an axis, as indicated in Figs. 6, 7, and 8, which action is so timed that the several fingers G H, nippers $g$, and finger E" operate to form the several actions upon the tube substantially in the manner as indicated in Figs. 2 to 8. As this folding action is completed the fingers G H quickly fly out of the folds of the tubes when their arms $G^2$ $H^2$ lift the cams I' I, and the bag in its folded condition is still held by the nipper $c$ and carried forward with the cylinder C. It is then delivered to the rolls S, *having pins $s$*, thence to the paste-rolls Q T, of which Q applies the paste after having received it from the rolls P P and vat O. The bottom is then folded by the knife $r$, which folds the paper upon itself between pressure-rolls R R. It is quite evident that the *delivery*, paste, and subsequent folding devices may be made in any of the well-known manners, and their particular construction is

immaterial to my invention. I do not, therefore, deem it necessary to describe the minute details of these devices, but illustrate them so as to show their relative position in a machine of the class described.

When the cylinder C advances sufficiently to deliver the bag to the feed-rolls S, the starwheel reaches the pin C² and opens the nipper c to release the paper bag, and the said nipper remains open until it reaches the pin C³, which closes the nipper upon another bag-tube. I have shown two such nippers and their operating mechanism, and it is evident that so far as my improvements are concerned one or more of these devices may be employed by simply reducing or enlarging the diameter of the cylinder C, maintaining its surface speed the same.

As soon as the tube has been withdrawn from the plate E the said plate is caused to return to its original position by the operation of the arm F, cams, and gears, so that it shall be in the proper position to receive the next paper tube. As before explained, the gear M' is in effect substantially a rack, but moved by cam K, and as the arm F is oscillated about f as a center by cam K' the intermediate gear M and gear N causes a proper rotation or oscillation of the plate E about e as a center. The movement of the arm F is governed by the cam K̶'̶ ̶a̶n̶d̶ ̶a̶r̶m̶ ̶F̶'̶, gear K, and is so timed that while permitting the rotation or oscillation of the plate E about its axis e it insures the edge W moving exactly at the same speed of the surface speed of the cylinder C, so as not to displace in any manner the tube.

While I have shown the nippers upon the cylinder C, they are not necessary, as the paper tube may be severed into bag-tube sections W. Fig. 10, but left connected by short connections w, Fig. 11, so that it is in effect pulled by itself about cylinder C under the action of the rolls S'. The rollers S' may be cutting-rolls, which while drawing the tube-section through sever the bag-tube sections before they go to the pasting devices. This method of operating is indicated in Fig. 9. It will be observed that as the tube is bent over the cylinder C the upper layer will rise and pass above the finger E' of the former-plate E, In this case the bag-tube will have the diamond folds made upon the tube while still connected together. It will thus be seen that it is not necessary to employ the nippers upon the cylinder C, though it may be more desirable to use them.

It is evident that the mere mechanism for securing the several movements to the different parts may be modified or changed in various ways without departing from the spirit of the invention, and I do not, therefore, confine myself to the details of construction here shown.

What I claim as new, and desire to secure by Letters Patent, is—

1. In a paper-bag machine, the combination of a rotating cylinder provided with one or more pairs of side-folding fingers adapted to be moved toward or from each other, a forming-plate also provided with side-forming fingers adapted to be moved toward or from each other, means for operating said fingers at definite times during the formative action upon the bag-tube, operating means for the forming-plate adapted to cause the said plate to oscillate about its rear edge upon the surface of the cylinder during the rotary movement of said cylinder, the whole operating for the purpose of opening and forming the bottom of the bag-tube, and means to move the bag-tube with the cylinder.

2. In a paper-bag machine, the combination of the rotating cylinder provided with one or more pairs of side-folding fingers adapted to be moved toward or from each other, a forming-plate also provided with side-forming fingers adapted to be moved toward or from each other, means for operating said fingers at definite times during the formative action upon the bag-tube, operating means for the forming-plate adapted to cause the said plate to oscillate about its rear edge upon the surface of the cylinder during the rotary movement of said cylinder for the purpose of opening and forming the bottom of the bag-tube, a finger moving with the forming-plate for receiving the upper sheet of the tube and lifting it during the formative action, power devices for returning the forming-plate to its original position to receive a new bag-tube, and means to move the bag-tube with the cylinder.

3. In a paper-bag machine, the combination of the rotating cylinder provided with one or more pairs of side-folding fingers adapted to be moved toward or from each other, a forming-plate also provided with side-forming fingers adapted to be moved toward or from each other, means for operating said fingers at definite times during the formative action upon the bag-tube, operating

EASTERN PAPER BAG CO. V. CONTINENTAL PAPER BAG CO.    483

means for the forming-plate adapted to cause the said plate to oscillate about its rear edge upon the surface of the cylinder during the rotary movement of said cylinder for the purpose of opening and forming the bottom of the bag-tube, a finger moving with the forming-plate for receiving the upper sheet of the tube and lifting it during the formative action, power devices for returning the forming-plate to its original position to receive a new bag-tube, means to sustain the rear of the forming-plate clear of the surface of the revolving cylinder so as to permit the proper entrance of the paper bag between the former-plate and the surface of the cylinder, *and means to move the bag-tube with the cylinder.*

4. In a paper-bag machine, the combination of the rotating cylinder provided with one or more pairs of side-folding fingers adapted to be moved toward or from each other, a forming-plate also provided with forming side fingers adapted to be moved toward or from each other, means for operating said fingers at definite times during the formative action upon the bag-tube, operating means for the forming-plate adapted to cause the said plate to oscillate about its rear edge upon the surface of the cylinder during the rotary movement of said cylinder for the purpose of opening and forming the bottom of the bag-tube, means to sustain the rear of the forming-plate clear of the surface of the revolving cylinder so as to permit the proper entrance of the paper bag between the former-plate and the surface of the cylinder, *and means to move the bag-tube with the cylinder.*

5. In a paper-bag machine, the combination of a rotating cylinder provided with one or more nippers, power devices for opening and closing the nippers at predetermined intervals of time, pivoted side-forming fingers G G carried upon the surface of the cylinder and upon each side thereof so as to receive the bag-tube between them, power devices for operating the fingers G, G at definite times during their movement forward with the cylinder, a forming-plate E also provided with side-forming fingers H H adapted to be brought into aline-ment above the fingers G G in the preliminary operation of forming the bag, a movable frame to which said forming-plate is hinged, power devices for moving said movable frame, power devices for oscillating the said forming-plate upon the movable frame so that its rear edge travels in conjunction with and at the same rate of speed as the cylinder, and means for operating the forming-fingers of the former-plate.

6. In a paper-bag machine, the combination of a rotating cylinder provided with one or more nippers, power devices for opening and closing the nippers at predetermined intervals of time, pivoted forming-fingers G G carried upon the surface of the cylinder and upon each side thereof so as to receive the bag-tube between them, power devices for operating the fingers G G at definite times during their movement forward with the cylinder, a forming-plate E also provided with the forming-fingers H H adapted to be brought into alinement above the fingers G G in the preliminary operation of forming the bag and also provided with a finger rearwardly extending at its forward end for separating the upper layer of the bag-tube when opening the same during the oscillation of the plate, a movable frame to which said forming-plate is hinged, power devices for moving said movable frame, power devices for oscillating the said forming-plate upon the movable frame so that its rear edge travels in conjunction with and at the same rate of speed as the cylinder, and means for operating the forming-fingers of the forming-plate.

7. In a paper-bag machine, the combination of the rotating cylinder *for the bag-tube provided with* one or more pairs of folding-fingers adapted to be moved toward or from each other, a forming-plate also provided with forming-fingers adapted to be moved toward or from each other, means for operating said fingers at definite times during the formative action upon the bag-tube, operating means for the forming-plate adapted to cause the said plate to oscillate about its rear edge upon the surface of the cylinder during the rotary movement of said cylinder for the purpose of opening and forming the bottom of the bag-tube, and connecting mechanism for timing the movements of the rotating cylinder and the forming-plate.

8. In a paper-bag machine, the combination of a rotating cylinder provided with one or more nippers, power devices for opening and closing the nippers at predetermined intervals of time, pivoted forming-fingers G G carried upon the surface of the cylinder and upon each side thereof so as to receive the bag-

tube between them, power devices for operating the fingers G, G at definite times during their movement forward with the cylinder, a forming-plate E also provided with forming-fingers H H adapted to be brought into alinement above the fingers G G in the preliminary operation of forming the bag, a movable frame to which said forming-plate is hinged, power devices for moving said movable frame, power devices for oscillating the said forming-plate upon the movable frame so that its rear edge travels in conjunction with and at the same rate of speed as the cylinder, means for operating the forming-fingers of the forming-plate, and connecting devices for timing the movements of the movable frame the former-plate and the rotating cylinder.

In testimony of which invention I have hereunto set my hand.

Wm. Liddell.

Witnesses:
    R. M. Hunter.
    Ernest Howard Hunter.

The following are the drawings referred to in the application:

Betts, Betts, Sheffield & Betts, and Francis T. Chambers, for complainant.

Albert H. Walker, and Symonds, Snow, Cook & Hutchinson, for respondent.

PUTNAM, Circuit Judge. This is a bill in equity alleging infringements of the first, second, and seventh claims of the patent to William Liddell, stated therein to be for, "an improvement in paper bag machines," No. 558,969, issued on April 28, 1896, on an application filed on February 6, 1896. In line with the frankness with which the court has been dealt with, the respondent stated at the hearing that these three claims are so near alike that the question of infringement is the same in respect to all of them, as is also the question of validity. Therefore we will confine our explanations to the first claim, which is as follows:

"I. In a paper-bag machine, the combination of a rotating cylinder, provided with one or more pairs of side-folding fingers, adapted to be moved toward or from each other, a forming-plate, also provided with side-forming fingers, adapted to be moved toward or from each other, means for operating said fingers at definite times during the formative action upon the bag-tube, operating means for the forming-plate, adapted to cause the said plate to oscillate about its rear edge upon the surface of the cylinder during the rotary movement of said cylinder; the whole operating for the purpose of opening and forming the bottom of the bag-tube and means to move the bag-tube with the cylinder."

No machine was ever built for practical uses in accordance with the patent, but a model was constructed for this case. This is evidently a practical machine, and it is not maintained that it departs from the patent in any essential particular. Therefore we must find that the machine, as described in the patent, is practical. While, moreover, the complainant, previous to this litigation, had not practically demonstrated the utility of its machine, yet, if the complainant is correct in its propositions as to infringement, the respondent has shown it; so that, therefore, as to the issues of practicability and utility, there is no difficulty which presents itself to the court. We should also add that we understand the defense is limited as hereinafter stated, so that, in fact, no question is made on the points either of utility or practicability.

The principal defenses, as stated to us by the respondent, are two: First, that the respondent's machines do not infringe; and, second, that the patent in suit is void because the only distinctive part of the mechanism described and claimed therein was not invented by Liddell, but was contributed by one Hunter, and was inserted by him in the drawings and specification without the direction, procurement, or knowledge of Liddell. The first principal ground of defense has a double aspect, as follows: First, the respondent's machines were constructed in accordance with a patent to Edward E. Claussen, No. 598,497, issued on February 8, 1898, on an application filed on July 29, 1896. The respondent claims that Claussen's invention was prior to Liddell's, so that, conceding Liddell any invention, it would necessarily follow that the respondent's machine could not infringe the patent in suit. Second, conceding Liddell's priority, it is claimed

that the mechanism of the respondent's machines is substantially unlike the mechanism claimed in the complainant's patent.

. The bill asks for both an injunction and an account, and, though no issue has been made as to jurisdiction in equity for the account, it is maintained that, under the circumstances, equity will not take jurisdiction for an injunction. We have stated that no machine for practical manufacturing purposes was ever constructed under the Liddell patent. The record also shows that the complainant, so to speak, locked up its patent. It has never attempted to make any practical use of it, either itself or through licenses, and apparently its proposed policy has been to avoid this. In this respect, it has not the common excuse of a lack of means, as it is unquestioned that the complainant is a powerful and wealthy corporation. We have no doubt that the complainant stands in the common class of manufacturers who accumulate patents merely for the purpose of protecting their general industries and shutting out competitors. According to the view of the court as now constituted, there are, and can be, no peculiar rules applicable to bills in equity in causes touching alleged infringements of patents for invention, and such bills are governed by the general rules, except, of course, so far as the statute authorizes an award of damages, as well as an account of profits. Applying those general rules, it seems to the court, as now constituted, that a case like this at bar exhibits no interest involved as to which a complainant can suffer legal detriment pending litigation in the courts of common law. Nevertheless, in some way the practice seems to have crystallized otherwise, and the court sees no relief for the respondent in this direction, unless in some way obtained from the Supreme Court. The court is all the more indisposed to act on its own peculiar views because in any event, if the complainant's case has merits, it has not been claimed, as we have already said, that it is not entitled to maintain this bill for an accounting. An accounting would probably be quite as serious for the respondent as an injunction, which may be superseded during an appeal, while, also, an interlocutory order for an accounting and for nothing else would interpose long delays before reaching the appellate tribunals, which delays would not follow the ordinary decree for an injunction and a master.

This case presents mainly issues of fact, involving numerous details and considerations pro and con. They were argued with ability and thoroughness, covering the larger portion of a week. Many questions were thus sifted out, and results there reached by the court which it holds in mind satisfactorily to itself. It is not often of much value under such circumstances to develop such issues in judicial opinions, and frequently enlarging on details obscures the pith of the conclusions reached. For these reasons, the burden which the court must assume in undertaking to recall and state all the details of the various questions of fact, which were digested by it as the case was argued, would not be compensated for by the results of an attempt to do so universally, and therefore on at least some such questions our conclusions will be stated very briefly.

The respondent insists that the Liddell patent was the twentieth

in the line of patents in this special branch of the arts. This proposition, however, does not assist us, because, no matter how many may have preceded Liddell's, his is marked by a peculiar feature of novelty which clearly distinguishes it from all that went before it; all questions as to Claussen being for the present reserved. Unless anticipated by what is shown in Claussen's patent to which we have referred, the Liddell patent does disclose invention, and we think its nature is so clear, and, as we have said, so disconnected from what precedes it by such a hiatus, that, if the claims are as extensive as the invention, there is no difficulty so far as concerns the applications to the case of the rules with reference to equivalents.

The respondent states that the claims in issue can all be made to conform to patents in the prior art by simply substituting a reciprocating carrier for a rotating cylinder. This proposition is frequently urged on the courts, yet they are frequently compelled to disregard it as has been heretofore often explained. On this record we must find that, unless anticipated by the Claussen patent, the machine shown by the Liddell patent is the first in which, in lieu of a reciprocating carrier, a rotating cylinder could be used advantageously as the bed on which the folding can be performed. It is, however, claimed by the respondent that the mere suggestion of a rotating cylinder in lieu of a reciprocating carrier was not new with Liddell, and that, even if it had been, rotating cylinders and reciprocating carriers are such well-known equivalents that the substitution of one for the other cannot be regarded as involving invention. That this is not necessarily true under all circumstances was shown by the Circuit Court of Appeals for this circuit, in Watson v. Stevens, 51 Fed. 757, 2 C. C. A. 500.

As we have said, we are compelled to find on this record that the problem of combining a rotating cylinder with the mechanism which folds the peculiar paper-bag here in question was not satisfactorily solved before it was disclosed by Liddell or by Claussen. In Liddell, this novel feature is shown by that portion of claim 1, which is contained within the following words:

"Operating means for the forming-plate, adapted cause the said plate to oscillate about its rear edge upon the surface of the cylinder during the rotary movement of said cylinder."

It cannot fairly be questioned that the solution of the problem of substituting a rotary movement for a reciprocation in a paper-bag machine intended for this peculiar bag, by whomsoever made the substitution, be it Lorenz, Liddell, Hunter, or Claussen, involved invention, and this covers the fact that this invention did not constitute an advance in the state of the art in such a sense that the complainant deemed it advisable to discard its old machinery and use Liddell's. Invention may clearly exist, notwithstanding it does not accomplish so fundamental a result. It is enough that it addresses itself to any considerable portion of the community, as it did to the respondent, and creates an opportunity for electing for a choice between different methods; each having its own advantages. Numerous examples supporting this proposition might be cited, if it were necessary to do so.

Therefore what we have to deal with as the pith of Liddell's alleged invention is the combination of a rotating cylinder with means' for operating the forming-plate in connection therewith, limited, however, to means which cause the plate to oscillate about its rear edge on the surface thereof. The complainant maintains that Liddell's invention extended to the full breadth of this combination, whatever might be the method adopted to cause the forming-plate to oscillate about its rear edge. On the other hand, the respondent maintains that the invention was no broader than the details described in the specification. It is difficult to see on what the respondent can base this proposition. It refers to 19 preceding patents, aside from Claussen, as though they had some relation hereto. As we have said, there is such a hiatus between them and what appears on the face of the Liddell patent that they have no effect, either in narrowing or broadening the alleged Liddell invention. If any of them pointed out any form of combining the forming-plate with a rotating cylinder, they would, of course, narrow what Liddell could claim; but they have nothing of that kind. In order, however, to make it clear that Liddell had accomplished a practical invention and to conform with section 4888 of the Revised Statutes [U. S. Comp. St. 1901, p. 3383], it was prudent, if not necessary, for him to point out some practical method in which the forming-plate might be made to oscillate about its rear edge; but, in the absence of any expressions in his claim making the details thus pointed out an element therein, they would not, under the ordinary rules, be limited thereby. These details might be of such a character as to involve invention in themselves, and be the subject of separate claims or patents. They were not, however, separately claimed, and nothing in the record contradicts the presumption, arising from the issuing of the patent, that each of the several claims in suit could stand alone as representing in and of itself a patentable invention. Nothing in the manner in which the claims are expressed adopts as an element the detailed description contained in the specification. So far as the details of that description are concerned, they come within the ordinary rule of the preferable method. We have nothing in the prior art which narrows Liddell's invention as maintained by the complainant, and nothing to show that the details contained in the specifications are in any way necessary parts of the claims in suit, or that those claims are more narrow than the invention. Therefore we start with the proposition that Liddell's alleged invention covered every method of combining the rotating cylinder with the forming-plate by causing the plate to oscillate about its rear edge on the surface of the cylinder, and that the claims are as broad as the invention.

These general propositions, as to only one of which our conclusions are in substantial dispute, namely, that Liddell's means of causing the forming-plate to oscillate about its rear edge are not limited to the details pointed out in his specification, we will now follow out, taking up the specific defenses which seem to be particularly relied on by the respondent. In the order of these defenses we put the question of infringement first. This is the order adopted by the respondent, and, though theoretically, in disposing of infringement

suits, it should be the last, there are special reasons why, in this respect, we should follow it. The respondent claims that Claussen in fact was prior to Liddell. It avoids the word anticipated, because it does not wish to sink the question of infringement into that of anticipation. In its explanation of Claussen's priority, it does not maintain that Claussen constructed a practical machine prior to the admitted date of Liddell's conception, but it puts the case as follows: The intellectual origin of the respondent's machine occurred in the mind of Claussen on November 6, 1895, and was recorded by him on that day in a pencilled sketch, the original of which is in evidence, and what was shown by this pencilled sketch was afterwards carried forward by Claussen, through his further developments, into the Claussen patent, No. 598,497, already referred to, and into the respondent's machines, with a certain exception which the respondent maintains is not essential in this suit. These propositions and the effect of them can be more easily explained after a critical comparison of the Liddell and Claussen machines, which must be made on the direct issue of infringement. Claussen's patent was not applied for until several months after Liddell's issued. Therefore, if the question of identity is first settled, the decisions must have clearly established certain propositions as to the burden and weight of proof necessary to establish priority on the part of Claussen which must have due effect in determining the case before us. The respondent, however, undertakes to go on concurrently with both issues, namely, that of infringement and that of anticipation, putting these propositions as we have already generally stated, and putting them again more in detail, as follows:

"The defendant's machines are entitled to occupy a position in the art at least two months earlier than the position which the Liddell patent is entitled to occupy. That being the relative position of the defendant's machines and of the Liddell patent in the chronological history of the art of paper-bag machines, it must follow that the Liddell patent is void for want of novelty, on account of the prior Claussen invention, or it must follow that the defendant's machines do not constitute an infringement of the Liddell patent, for it is certain that a patent upon a later invention cannot be invoked to suppress an earlier invention."

We prefer, however, not to embarrass the case by examining these two questions in connection with each other, because to do so confuses the line of thought and leads to the danger of losing sight of the rules of evidence to which we have referred. It is clear that, if there is no similitude of the essence of the machines, there can be no infringement, and no question of anticipation will arise, and that will be the end of the case. It is also clear that, if similitude is found to exist, the question then becomes one of technical anticipation, and not of mere priority, to be determined according to settled rules of the patent law, and the rules of evidence applicable thereto to which we have referred. The path of safety is in taking up the question of similitude first, and then, if found necessary, the question of anticipation.

On the question of similitude the respondent, on the one hand, starts with a fundamental error as follows: It says in substance: Neither claim designates the operating means adapted to cause the

forming-plate to oscillate about its rear edge either by names, or by reference letters or numerals, and recourse must therefore be had to the descriptive part of the specification to ascertain what "operating means" are meant by that language in each of the claims. It may turn out that, on a careful examination, the correction of the erroneous departure which the respondent makes at this particular point will solve all it has to say on the question of similitude. On the other hand, no interference was declared by the Patent Office as between Claussen and Liddell. Moreover, there is nothing expressed specifically on the face of the Claussen patent to indicate that it was issued by the Patent Office as merely for an improvement on Liddell. Nor is there anything in the Patent Office file to indicate that the examiners cited Liddell as anticipating Claussen's application. Therefore the respondent is entitled to the presumption against infringement, which, under the general rules of law and the authorities, arise from these facts. While we have already expressed in a general way our conclusion against the proposition of the respondent, that recourse must be had to the descriptive part of the specification to ascertain what means are required by the language of each of the claims in suit, it may be well for us at this point to state more fully the reasons of that conclusion, and also to examine as to the prima facie effect of the granting of the patent to Claussen.

At this point it becomes necessary to explain more positively the pith of Liddell's invention. The complainant states that it relates to what is known in the arts as self-opening-square bags, or, in an abbreviated form, "S. O. S." bags or "Deering" bags. We understand that these several designations, wherever they appear in the record, mean the same. On this particular proposition the respondent makes no statement, except in the language of the patent, which is that it "has for its object the production of a perfectly-formed satchel-bottom bag in a speedy and accurate manner." This difference does not seem to require further attention. The claims in issue deal only with making the "diamond" fold. Aside from the cylinder and the forming-plate oscillating about its rear edge, everything in these claims is necessarily old in the arts. The cylinder, also, is found in patent No. 333,647, issued on January 5, 1886, to Lorenz and Honiss, the central feature of which was said to be the continuously-rotating cylinder; but, in lieu of a forming-plate oscillating on its rear edge, the means used for making the "diamond" fold were the blades of "one or more pairs of box-folding mechanisms." Whatever these were, there is no evidence that they were the equivalent of Liddell's forming-plate oscillating about its rear edge, or that the combination of the cylinder with either the box-folding mechanism or the forming-plate oscillating on its rear edge would be the equivalent of each other in the arts. The only witness on this topic is Claussen, admitted by both sides to be a sufficient expert. He confirms our proposition. All said to us in argument was that Lorenz and Honiss provided a cylindrical bed in their patent, but there was no claim that they anticipated Liddell in the particular which we are discussing. There is only the general proposition that, taking the claims in suit literally, they could all be made to conform to some particular patent

in the prior art by merely substituting a reciprocating carrier for the rotating cylinder. The respondent maintains that its bed is neither the Lorenz and Honiss bed nor the Liddell bed; but, if it intended to maintain that the combination of the cylindrical bed with one or more box-folding mechanisms was the same as a combination of the cylindrical bed with Liddell's forming-plate oscillating about its rear edge, it has failed to positively so state, or to call our attention to any proofs in the record to that effect. It has also failed to show us that the Lorenz and Honiss machine proved to be a practical one, or why, if it was practical, it did not make use of it as it might have done, the patent having expired, in lieu of machines involving, as we are asked to find, the precise principle of Liddell's invention.

Liddell describes his invention as follows:

"This application comprehends certain mechanism for forming a satchel bottom upon the tube in the manufacture of paper bags, and has for its object the production of a perfectly-formed satchel-bottomed bag in a speedy and accurate manner. My improvements, briefly stated, may be described as follows: The tube is received upon a revolving cylinder and carried forward by a nipper, which clamps the lower sheet of the tube, or by other means hereinafter described. The upper sheet of the tube passes above a finger upon a movable forming-plate, securely held at a short distance from the revolving cylinder, and between which and the cylinder the tube is guided. The forming-plate is then caused to rotate about its rear edge simultaneously with its movement or travel with the revolving cylinder, thereby opening the end of the tube, spreading the side folds, and marking a creased line transversely. Simultaneously with this, forming-fingers are projected into the side folds; one pair being adapted to the cylinder and the other pair to the forming-plate. A continued movement of the parts causes the upper layer or sheet of the tube to be completely turned backward upon itself, and at the same time the forming-fingers, together with the other parts, insure the proper formation of the diamond fold. The tube in this shape leaves the revolving cylinder, passes to the pasting devices, and thence to the folder."

The complainant's counsel explained the duty performed by the forming-plate as follows: It has, through its engaging fingers, the function and duty of carrying the upper plies of the blank for the bag upward and backward with reference to the lower plies held on the folding-bed, so as to distend the mouth of the blank, and thus the forming-plate is first brought to a position of practically parallel registration with the folding-bed at the time the blank is fed to the bed, and then, as the bed moves backward in its rotating path, the plate also rotates until the diamond is practically spread out and formed.

In further explanation of the pith of the invention, the complainant invites us to read the testimony of Dayton, 12 printed pages, and to analyze it for ourselves. On turning to it, we find his testimony too much of the class to which experts often devote themselves. Such testimony should ordinarily be limited to pointing out the mechanical principles involved, and the state of the whole art, and showing us the pith of the specification from a mechanical standpoint. We find in his testimony, however, the following pithy expressions, which it seems to us to represent the true nature and breadth of Liddell's invention. Dayton says that, in order to form the "diamond," while the rotary bed of the cylinder is advancing, the upper fold of the

tubular blank must be elevated and turned back towards and over the body of the blank.

Of course, mechanism which can be kept travelling in one direction, as Liddell's can, may run with greater speed than mechanism which reciprocates, and would ordinarily produce more uniform results. It is hardly necessary for us to refer to proofs on that point, but Stone, the respondent's expert, testifies directly to that effect. Also, like almost every other step in the art of making paper-bags automatically, it is apparent that the conception, by means of which the folding mechanism could be successfully combined with a rotating movement, in lieu of a reciprocating one, presented a problem which would be solved only by accident or by ingenuity. It is also apparent to the common mind, when once brought to its attention, that the principles involved in the operation of a forming-plate oscillating on its rear edge, and thus easily opening up and turning back the folds as the revolution of the cylinder proceeds, would afford a solution. Admitting, as said by the respondent, that the suggestion of making use of cylindrical motion in the art was not new with Liddell, and although clearly it had been previously used by Lorenz and Honiss, and although it may also be supposed to have been in the minds of many others, and admitting that the complicated mechanism of Lorenz and Honiss in their patent already referred to was capable of producing a result, yet, after they were disclosed, it was easily apparent that the means adopted by Liddell were the natural method of reaching success. Such is the view of the invention in issue which impresses it self on the mind of the court.

From what appears as to the state of the art, it must be held that the invention in issue lies in the peculiar suggestion of oscillating the forming-plate on its rear edge, and that, subject to what is claimed by the respondent as to Claussen, Liddell having pointed out how that suggestion could be practically worked out, his invention, his patent, and his claims, and his rights against infringers are as broad as that suggestion. This is a broad application of the laws of mechanical forces and all the rest is detail, which detail can be worked out in the manner pointed out by the specification, or in any other method. Whether the method thus worked out is of such a character that it might be accomplished by any one skilled in the art, or whether it, in and of itself, might involve a separate and distinct invention, and be capable of a separate and distinct claim, or of forming the basis of a separate patent, is of no consequence to this case. Section 4888 of the Revised Statutes [U. S. Comp. St. 1901, p. 3383] makes it a condition that the principle of the patented machine shall be explained, and also the mode in which the patentee contemplates applying that principle, but this is only a condition on which a patent issues, so that, when this condition is once met, this no longer limits the rights of the patentee. Even in the case of a newly discovered art, using the words of the statute so often replaced to a certain extent in the text-books and decisions of the courts by the word process, it is settled that this rule applies. Tilghman v. Proctor, 102 U. S. 707, 728, 26 L. Ed. 279; The Telephone Cases, 126 U. S. 536, 8 Sup. Ct. 778, 31 L. Ed. 863; Walker on Pat-

ents (4th Ed. 1904) 160. In the case of that subdivision of the word "art" ordinarily spoken of as process, it seems to be rare that this rule is applied, as the claim ordinarily must point out all the essential steps of the process. It is, however, easily and frequently applied to a machine, where it is a very common fact that the patentees are protected, although the infringer may make use of other means than those employed by them. Deering v. Winona Harvester Works, 155 U. S. 286, 302, 15 Sup. Ct. 118, 39 L. Ed. 153. Indeed, though not said from the precise point of view from which we are speaking, the observation of Chief Justice Fuller in Howe Machine Company v. National Needle Company, 134 U. S. 388, 394, 10 Sup. Ct. 570, 572, 33 L. Ed. 963, is very pat:

"The specification and drawings are usually looked at only for the purpose of better understanding the meaning of the claim, and certainly not for the purpose of changing it and making it different from what it is."

The respondent states that "the functions of the defendant's machine and the mechanism of the Liddell patent are identically the same," although it adds the further proposition that "the mode of operation of these two mechanisms are both theoretically and practically different." This further proposition is evidently based on the error to which we have referred, namely, that the various details of the mechanism pointed out in the specifications are essential parts of the invention and the claims. The truth is, as we have shown, that the identity of function as between the two mechanisms is the entire substance on this question of infringement, because Liddell's invention is only the application of certain laws of mechanical forces, as explained by what we have cited, to the effect that, while the tubular blank is advancing, its upper fold must be elevated and turned back on the body of the blank, and no mere mode of operation is involved in Liddell's invention beyond the single matter of oscillating the forming-plate about its rear edge.

Before coming to the details of the difference in structure relied on by the respondent, we must dispose of the presumption in its favor, arising from the issuing of the patent to Claussen, so far as there is any such presumption. We did not understand at the hearing that this point was urged on us, or even brought to our attention. Nevertheless, it is one which the court ought fairly not to overlook. Of course, if this were a case of double patenting—that is, if the patent issued to Claussen was exactly what was patented by Liddell, no more and no less—a presumption would arise therefrom in favor of the respondent, but even in that event the presumption would not be strong enough to overcome the facts as we find them, and as applied to this particular case, in the way in which we have developed it. But, on the face of the papers, there is no double patenting. Walker on Patents (4th Ed. 1904) touches on this question at two points at least. At page 167, the learned author treats of this topic where both patents issued to the same patentee. At page 278, he refers to interfering patents. Of course, we need not point out that no presumption will arise, unless the patents to Liddell and Claussen were interfering patents. The learned author, at the page last cited, says:

"But a generic claim and a specific claim, the first of which secures a particular process or mechanism with its indispensable characteristics, with or without its minor features, and the last of which secures the same process or mechanism, with, but not without, its minor features, are not co-extensive claims, and therefore do not interfere with each other."

On the face of the patents that is precisely the case here. The first 12 claims of the Claussen patent specify, as an element, an oscillating carrier. Some of the remaining claims specify the same oscillating character, but those which do not relate purely to matters of detail in no way assume to claim the pith of the controverted invention. In addition to that, the specification of the Claussen patent contains nine columns of description of details. Therefore, while the Patent Office might well have regarded that patent as doubtful in its nature, there is nothing on its face to show that it related to anything more than improvements in matters of detail, including, with the rest, a peculiar species of carrier, none of them referred to in the Liddell patent. So far as we are advised, there is nothing in the record to show that the two were regarded by the Patent Office as interfering patents, so that we may dismiss from the case any such presumption as we are now considering.

Coming now directly to the detailed propositions which the respondent relies on with regard to the question of infringement, they are as we have seen that, while the respondent admits that the functions of the defendant's machine and the mechanism of the Liddell patent are identically the same, the modes of operation are theoretically and practically different. In this connection, we return again to the following language of the respondent, which we have already referred to:

"Neither of those claims," meaning the claims in suit, "designate those operating means," intending the means for operating the forming-plate, "either by names, or by reference letters or numerals. Recourse must, therefore, be had to the descriptive part of the specifications to ascertain what operating means are meant by that language in each of the claims."

We have shown that this is fundamental error on the part of the respondent, and need not return to it, although, perhaps, the leading proposition of the respondent on this topic—that is, its proposition that it does not use the cylinder of the Liddell patent—cannot thus be disposed of.

The respondent sums up what it says on the question of infringement in five propositions. The first and second represent the respondent's view of the relation of the Liddell patent to the art in view of the preceding 19 patents, a topic which we have already disposed of. The third maintains that the "particular mechanism" claimed to infringe the patent in suit is both analytically and synthetically so different from the mechanism of the Liddell patent that it cannot be held to infringe any claim of that patent. We have already shown that, so far as the real novelty of the claims in suit are concerned, we have nothing to do with the particular mechanism, so that this third proposition will be found not to apply. The fourth and fifth are only minor propositions, which we do not find it necessary to consider. In opening up the topic of infringement, the respondent divides the

claims in suit into the first, second, and third divisions. Subsequently it refers to four divisions of the respondent in this relation. The rotating cylinder, provided with the side-forming fingers and the lower-forward fingers, constitutes the first division. The respondent also states that two of the Liddell claims specify "means to move the bag-tube with the cylinder." It, however, properly lays this aside upon the ground that it would be implied whether it is specifically stated or not. According to the respondent, the "forming-plate, provided with side-forming fingers," constitutes the second division. It also adds that claims one and seven fail to expressly call for the upper-forward fingers, although claim two does so, but that finger is called for by implication. Then it proceeds as follows:

"The third division of the claimed mechanism is specified in each of the last three claims," meaning claims 1, 2, and 7, "as means for operating the side-folding fingers and the side-forming fingers at definite times, and the specification and drawings indicate that those means consist in certain cams, arms, springs, and rods, which are shown in Fig. 2 of the drawings of the patent."

We may as well dispose at this point of what the respondent says as to the matters to which this third division relates. It will be found as we proceed that this division, with the amendment to the answer, which we must then fully consider, and which was allowed on March 2, 1903, shows that at that time the respondent, if not the complainant, considered that at least seven of the claims of the patent in suit, being those from one to seven each, inclusive, were in issue. We have not specially examined the claims, aside from claims 1, 2, and 7, but we infer, from what examination we have given and some matters that appeared at the hearing, that they relate largely, if not entirely, to details of the mechanism shown in Liddell's specification and drawings. As we have said, only claims 1, 2, and 7 are now in issue. At what stage of the case, either with reference to the taking of proofs or the preparation of the briefs, this change became apparent, we are not advised, but presumably a large portion of the testimony and many expressions of witnesses, including those concerning the extent and nature of Liddell's alleged invention, or inventions, had relation to some other seven claims than those we are now considering. Therefore, presumably for that reason, even witnesses for the complainant have described the Liddell invention, or inventions, as covering details, while we have described it, or them, as relating only to fundamental combinations in the way in which we have done. Thus, presumably in this way, many expressions on the part of the complainant's witnesses, including the experts, would seem to justify the proposition of the respondent that the invention, or inventions, in suit cover mechanical details. However this may be, the court, which, in patent suits, stands not only for the parties, but, in a certain sense for the public, must accept the condition as it clearly finds it, regardless of propositions by the litigants pro and con. This applies with particular force to patent suits, as to which the court must have in view, not only the interests of the public, but the desirability of reaching uniform results in various suits relating to the same patent. However all this may be, it is plain, in the

light of the views we have already emphatically expressed, that we need not concern ourselves further about the third division, which clearly on its face relates to mere mechanical details no way involved in the inventions covered by claims 1, 2, and 7.

Then comes what may be called the fourth division. Here the respondent says that what we have already considered as enumerated in the first, second, and third division of the respondent's analysis of the claims in suit does not extend to mechanism for causing the forming-plate to oscillate with the rotation of the cylinder. The respondent then particularly cites the words "operating means for the forming-plate, adapted to cause the said plate to oscillate about its rear edge," etc.

As to the first division, the respondent says that its machine does not include any cylinder, although it does include one or more pairs of side-folding fingers and a forward finger, or clip. This therefore relates only to the cylinder, which we will hereafter consider. As to the second division, it says that the forming-plate of the Liddell patent is provided with a pivot at the right hand edge thereof, has an upper forward finger fastened thereto at the right hand edge, and one of its forming fingers in its place under the forming-plate. The respondent proceeds that the difference in construction and mode of operation between its fingers and Liddell's are considerable, but that the respondent passes over that subject to explain what it alleges to be a far more important difference between its plate and the Liddell plate, growing out of the fact that the respondent's plate oscillates on a pivot midway between its two edges, instead of on a pivot at its forward edge, as in the Liddell patent. If there are any such differences whatever with reference to the forming-plate and its method of operation, they are obviously of the same mechanical character which we have already described, of no importance in this case, because the claims in issue require only that the forming-plate shall oscillate about its rear edge on the surface of the cylinder. As we have said, the application of the mechanical laws by virtue of which a forming-plate, oscillating about its rear edge, so that necessarily, as the cylinder advances, the plate turns the ends of the paper-bag blank back upon its body, form the essence of this element in the claims, and neither the invention nor the claims involve any particular method or mechanism by which the oscillating about the rear edge is accomplished. The method in which the respondent closes this part of its case establishes in a general way what we have said. It observes, in substance, that it had also analyzed the mechanism of the respondent's machine; it had compared the first, second, third, and fourth divisions of its mechanisms with the first, second, third, and fourth divisions of the Liddell patent; and that it has thus shown that the mechanism claimed under the Liddell patent is very different "in all its details" from those of the respondent's machine. The words "in all its details" we quote from this portion of the respondent's concluding proposition on this point, where, also, it makes no claim of differences except in details.

The respondent then turns to what it styles its synthetical comparison of the mechanism in question, and it thereupon maintains

that the two mechanisms in question as a whole are so unlike each other that it is impossible to conceive how the complainant could maintain that the respondent had infringed. This, however, seems to us nothing more than to maintain that the various differences to which we have referred create a total lack of similarity. Therefore it can have no relation, except to differences none of which are essential, yet what is negative cannot be made to count by any process of addition or grouping.

We now have remaining on this part of the case only the matter of the cylinder. The proposition is that the Claussen patent shows only a "rotating conveyer" with two oscillating carriers pivoted thereon. There is no question that the complainant does not have the oscillating carriers, and it may be that in this respect the respondent's machine is an improvement on the complainant's, but the oscillating carriers only supplement the oscillating forming-plate, without removing from the plate the pecularity of oscillating on its rear edge claimed by Liddell. The respondent relies on the distinction, over and over again referred to by it, that instead of a cylinder it has a rotating conveyer, or, to put it otherwise, instead of having the cylinder of the Liddell patent, the respondent's machine has an irregular and peculiarly shaped conveying frame. This irregularity, we may say in a general way, consists in depressions made for the reception and locating of the oscillating carriers. The respondent maintains that the conveyer and the carrier do not constitute a cylinder, because it says that a cylinder is defined as a solid, whose curved bounding surface is generated by the motion of a straight line, etc., citing what is the usual definition. This appears to be an extraordinary refinement of language, and, in view of the fact that the claims of the Claussen patent over and over again describe the conveyer, not as a rotating conveyer, but as "a cylinder provided with a mutilation," and over and over again speak of the carrier as "pivotedly mounted on the cylinder," how can the respondent claim that the word cylinder in the complainant's patent is to be construed more rigidly than the same word in the respondent's patent? It does not escape from the complainant by merely using the expression "rotating conveyer," because clearly an ellipse, rotated for the purpose and in the manner pointed out in the patent in suit with reference to the cylinder would be a rotating conveyer, and common sense would reject the proposition that an ellipse arranged to rotate as the complainant's cylinder rotates, and as undoubtedly could be arranged, would not be a clear imitation and infringement under color of the complainant's invention.

The definition which the respondent cites is that of a "right cylinder" as mathematically known. This is mathematically exact, and, morever, is a solid, as is expressed by the respondent itself. Yet, of course, the word cylinder is often used as meaning a cylindrical body which is hollow. It would be absurd to maintain that the glass body which is so often spoken of in connection with electrical machines as a "Glass cylinder" need either be a solid or a "right cylinder," or anything more than an approximate cylinder. Anything which approximates a right cylinder and which permits the friction necessary in

generating electricity would be called in the science of electricity a cylinder.   Indeed, in mathematics, the word cylinder is often used so loosely that in order to point out a "right cylinder," such as is described by the respondent, it is sometimes advisable to connect with it the word "circular," styling it a circular cylinder.   Chauvet's Elementary Geometry, 239.   This is true to such an extent that the Standard Dictionary correctly defines one use of the word cylinder as follows:   "Any cylindrical portion of a machine, especially if hollow, proportioned so as that the length of it exceeds the diameter." Then it follows with illustrations, giving some examples in which very little of the true circular form is left.   Looking at the respondent's proposition in this particular, either from the point of similitude in connection with any use of the word cylinder, except the strict mathematical sense which the respondent relies on, or from the point of equivalency, in view of the fact that the essence of the complainant's invention and claims in the useful combination with a 'surface which is endless through revolution, it is impossible to maintain the respondent's position without flying directly into the face of Winans v. Denmead, 15 How. 330, 14 L. Ed. 717, shown by the Circuit Court of Appeals for this circuit in Reece Company v. Globe Company, 61 Fed. 958, 964, 10 C. C. A. 194, to have always been recognized as law.   Therefore, as to every essential portion of the defense of infringement, we must hold that the case is with the complainant.

We now come to what apparently should be spoken of in the plural; that is to say, the defenses set up by the amendment to the answer already spoken of, allowed on March 3, 1903, which, in justice to all concerned, we must quote at length:

"The defendant says, on information and belief, that said Liddell letters patent No. 558,969, are void, because William Liddell was not the original, first, and sole inventor of the combination claimed in any claim of said letters patent, and because that subcombination of each of those combinations, which is designated in claims 1, 2, 3, 4, and 7 of said patent as 'operating means for the forming-plate adapted to cause the plate to oscillate about its rear edge upon the surface of the cylinder during the rotary movement of said cylinder,' and which is designated in claims 5 and 6 of said letters patent as 'power devices for oscillating the said forming-plate upon the movable frame, so that its rear edge travels in conjunction with, and at the same rate of speed as, the cylinder's, and which subcombination is shown in the drawings of said patent to consist of the cam, K', the cam, K, the arm, F', the arm, F, the rod, K, the link, k2, the arm connecting that link to the gear, M1, and also that gear, M', the upper gear, M, the lower gear, M, and the gear, N, was never invented or planned by William Liddell, but was contrived by some other person without his knowledge, and was inserted in the combination of each of the claims in the letters patent, and in the description and drawings of that patent without his direction or procurement; and because the said subcombination thus contrived, and introduced into the Liddell patent, by some person other than William Liddell, is the most essential and only distinctive part of the mechanism described in that patent and delineated in the drawings thereof.   The defendant says, on information and belief, that said Liddell patent, No. 558,969, is void, because Rudolph M. Hunter, or some other person, other than William Liddell, participated in inventing the combination which is claimed in claim 1, and the combination which is claimed in claim 2, and the combination which is claimed in claim 3, and the combination which is claimed in claim 4, and the combination which is claimed in claim 5, and the combination which is claimed in claim 6, and the combination which is claimed in claim 7, of said letters patent."

This amendment to the answer raises two defenses, which, from one standpoint, are not only separate, but of a distinct character, while, from another standpoint, they may be treated together, because they constitute one transaction, and depend, on one side and the other, on the contradictory testimony of the same witnesses as to the same proceedings. We will look first at the second aspect. This comes within the rule, applied in so many different directions, that, as such defenses impugn a patent for an invention, issued with apparent regularity, they cannot be successfully supported as are ordinary issues in civil suits, but a mere preponderance of proofs, but they require to be supported, to put it in the mildest way, by proofs which are satisfactory to the court. This is especially emphasized in this case, because, while, as appears from the patent in suit, the application therefor was filed in February, 1896, this bill was filed on October 11, 1901, the amendment bringing in these defenses was not allowed until March, 1903, and the proofs in reference thereto were taken in the years 1903 and 1904, from seven to eight years after the date of the application, and this is the first time that an attack of this character has been made on the Liddell patent. For this and other reasons, it happens that none of the witnesses have had occasion to recall any of the facts touching the pith of the matters put in controversy by this amendment. It also happens that there is no existing document or record, or other cotemporaneous thing, which directly supports the testimony of either as to the fundamental facts as to which they differ, except to some extent with reference to the complainant's use. Reflections on all those witnesses who contradicted each other have been suggested by the parties pro and con, none of which have impressed the court. A portion of this evidence is clearly based on inferences, and not on recollection, either clear or hazy. For these reasons, and also because there has never been any occasion to recall them, or to fix them in the memory of the witnesses, the testimony as a whole is not of the character which is required on issues of this class, although, aside from certain peculiarities, which, according to the rules of evidence, can be developed only on cross-examination, and therefore cannot be gainsaid by the parties developing them peculiarities allowable only for the purpose of making the court or jury acquainted with the witness, and peculiarities, which, in this case, do not particularly affect the integrity of any one, and which in this case have not aided the court in any respect, the witnesses, as we have said, stand unimpeached.

As the defenses brought in by the amendment necessarily stand on the same testimony, each therefore involves, not merely the charge of fraud, but a criminal offense of a very high and serious character, if not under section 5418 of the Revised Statutes, at least under the common law or statutes of the state. Therefore the rule to which we refer has particular application. It may well be said that it goes to the extent of requiring, as held by the Circuit Court of Appeals for this circuit, in American Bell Telephone Company v. United States, 68 Fed. 542, 15 C. C. A. 569, and as expressly affirmed by the Supreme Court in the same case on appeal, 167 U. S. 224, 251, 17 Sup. Ct. 809, 42 L. Ed. 144, that, under the circum-

stances, the proofs must be "clear, unequivocal, and convincing." For a broader application of the same rule, we may refer to Lalone v. United States, 164 U. S. 255, 257, 17 Sup. Ct. 74, 41 L. Ed. 425.

As what we have to observe on this rule of evidence concerns, not only the particular defenses which we are considering, but also the defense of alleged priority of invention on the part of Claussen, we deem it advisable to refer to two cases decided by the Circuit Court of Appeals for this Circuit. Brooks v. Sacks, 81 Fed. 403, 405, 406, 407, 26 C. C. A. 456, and Westinghouse Company v. Stanley Company, 133 Fed. 167, 177, 178, 179, 68 C. C. A. 523. These cases related especially to questions of priority. In Brooks v. Sacks we showed that, on the authority of the Supreme Court, the rule applies, not only as between an inventor and one who claims priority, but as between one who establishes an apparent priority and the inventor, when the latter undertakes to rebut that established priority by showing a still earlier priority than that disclosed on the face of his patent. That case was between an alleged inventor and an alleged infringer. The events covered a period of fully six years prior to the witnesses giving their testimony; and, although all the witnesses stood unimpeached so far as their integrity was concerned, the evidence offered in behalf of the inventor, who undertook to establish the priority in rebuttal, was not accepted by the court because it was not authenticated by any supporting facts of a concrete or visible character. On the other hand, in Westinghouse Company v. Stanley Company, the court accepted the evidence of priority offered in behalf of the inventor on the ground that the application for a certain other patent established a certain date earlier than that of the application for the patent in suit, and created in behalf of the patentee an inference of a sufficiently earlier rebuttal date, which inference thus established was so persuasive that the court was compelled to yield to it. In that case, also, the principal witness in behalf of the inventor had previously testified on several occasions, all to the same effect, the earliest of which occasions was in connection with an interference declared against the patentee before the patent issued. As also said, there was in behalf of the patentee a certain atmosphere of probability, and, on the part of the principal witness, an interest continuous from the time he was first informed of the invented conception in question. Thus the inventor's claim to priority was supported in the various ways we have pointed out. In the case at bar, however, the proofs offered by the respondent in regard to the defense brought in by the amendment are not supported by a scrap of anything relating to the substance of the events cotemporaneous with them. None of the witnesses had had occasion to consider the occurrences during a period of more than seven years, and the witnesses pro and con are subject to the observations affecting the value of their testimony, which we will make from time to time as we proceed. None of them had any special interest in maintaining a continuous recollection of what occurred, and, in view especially of the fact that the solicitor for the complainant, or rather for its predecessor in title, which solicitor we will refer to again, stands charged on the respondent's case, as we have shown, not only with fraud, but with

a serious criminal offense, although in all other respects his integri-ty is not questioned, the balance of the probabilities will be found to lie with the complainant, and not with the respondent. Considering the rule of evidence to which we have referred, the case is too clear for the complainant on these issues to require us to go at great length into the disputed facts, although we necessarily must touch on them, and explain the nature of the proofs, as we develop the defenses which we have now reached. Another reason for not weighing all the proofs is the fact that we need go only far enough to point out that the respondent cannot maintain the burden which we have shown is required as to all the defenses which remain to be considered.

As we have said, the defenses raised by the respondent's amendment to its answer are two: First, in substance, that Liddell was not the sole inventor of the combination covered by the claims in issue, and that Rudolph M. Hunter was either the sole or joint inventor thereof. It will appear that it cannot be questioned that Hunter contributed to the specification at least certain details of a mechanical character, while it is claimed by the respondent that he contributed to claims 1, 2, and 7 an essential element thereof, to such an extent that Liddell could not take out a patent for the combination covered by them as sole inventor.

The other defense is in substance that Liddell, on the 7th of January, 1896, in Hunter's office, made oath to an application for this patent in accordance with section 4892 of the Revised Statutes [U. S. Comp. St. 1901, p. 3384], and that subsequently, a few days after Liddell left Hunter's office, and without Liddell's previous consent or subsequent approval, Hunter amended the specification, claims, and drawings, rewrote the whole, withdrew the whole of what Liddell had made oath to, except the formal introductory and closing pages, and substituted an entire new draft, and thereafterwards filed in the Patent Office an application with the new matter thus substituted. Although Hunter, as Liddell's solicitor, held Liddell's power of attorney in the usual manner authorizing amendments, yet, as such power of attorney would not, either by its purpose or under the law, authorize making amendments after the oath was taken by Liddell and before the application was filed in the Patent Office, or even after the application was filed in the Patent Office, any amendments, except of an incidental character, and with the knowledge and consent of the Patent Office, the acts alleged by the respondent to have been done by Hunter, were, as is well known to every Patent Office solicitor, illegal, and of such a character that at least the United States, if not individuals acting as such, could by proper proceedings avoid the patent. The respondent also claims that, on account of its interest as an alleged infringer, it can set up the alleged acts of Hunter as a defense in this proceeding.

As we have already said, these two defenses rest on the testimony of the same witnesses, relate to the same transactions, and are to a very large extent so interwoven that it would be a waste of time to undertake to analyze separately the entire record with reference to each, although the manner in which we will to some extent discuss them must necessarily create some confusion, and is not strictly the most logical method. The essential witness on behalf of the complainant on these

issues is Rudolph M. Hunter, and those on behalf of the respondent are Liddell, the patentee, and one Drury, who was an independent draughtsman, but frequently employed by Hunter. As already said, it must be admitted that Hunter contributed to the application certain mechanical details, which, either through haste or through inability, Liddell had failed to supply. Beyond that, the respondent insists that all that Liddell invented was a forming-plate which rotated through the entire arc of the circle, and that the substitution in lieu therefor of an oscillating forming-plate, which revolved in performing its duty only through that portion of the circle where its duty was performed, after which it oscillated back to the point where its duty commenced, was contributed by Hunter. In view of what must be thus admitted, and what is thus claimed, it is necessary for us to return to the law on this topic, which we have already spoken of to some extent, and to state it more forcibly than we have heretofore done.

We have in a general way observed that the fact that a stranger contributes to the mechanism necessary to make an invention operative, whether that contribution is such that a mechanic of ordinary skill in the art might be supposed to supply it or whether this involves invention, would not affect any claims in the patent which do not cover the mechanism thus supplied, either as a whole or in combination. Our views on this point will be better understood by calling attention to certain underlying principles, and also to several authorities. These develop in two different directions. As the Circuit Court of Appeals for this circuit said in Packard v. Lacing Stud Company, 70 Fed. 66, 67, 16 C. C. A. 639, the law does not require that an inventor shall himself overcome the minor details necessary to perfecting his invention, and "persons possessed of most brilliant conceptions are sometimes the poorest mechanics." These propositions have been developed over and over again and in every possible manner in The Telephone Cases, first and last. The application of this rule in Agawam Company v. Jordan, 7 Wall. 583, 19 L. Ed. 177, shows its sweep and the almost unlimited extent to which it may be applied. There it appears at page 587 of 7 Wall. (19 L. Ed. 177) that the inventor was absolutely unable to practically work out his invention, and submitted his conceptions to a blacksmith, who had been taken into the employment of the inventor. Upon the inventor explained to his employé his conceptions and his attempted method of putting them into practice, the employé observed that the agencies which he thought to employ were bad, and suggested substitutes. Thereupon the inventor said to his employé that, if the employé could give him a solution, he would give the employé one-half of what could be made from the invention, besides a considerable sum which he named. After some experimenting with the employé's methods, they proved successful, and were incorporated into the specification. The opinion rendered in behalf of the court, at page 603 of 7 Wall. (19 L. Ed. 177), states that, where the employer has conceived the plan of the invention, and is engaged in perfecting it, "no suggestion from an employé, not amounting to a new method of arrangement, which, in itself, is a complete invention, is sufficient to deprive the employer of the property in the perfected improvement," and the patent was sustained. In Walker on Patents (4th Ed. 1904), beginning with section 45, the

learned author puts the matter pro and con very clearly. He says: "If one man does all the inventing and another man does all the construction, the first is the sole inventor." He then takes up the case of Agawam Company v. Jordan, to which we have just referred. He then observes, as was said in Packard v. Lacing Stud Company, that, "to constitute a man an inventor, it is not necessary for him to have skill enough to embody his invention into a working machine, into a model, or even into a drawing." He also observes:

"Where several independent inventions are claimed by several different claims in a joint patent, and where one of these inventions was made by one of the joint applicants for the patent without any cooperation of another joint applicant, the claim of the patent which covers that invention is void."

It will be noticed that this by implication leaves standing all the claims, except the one stated to be void. This rule, of course, applies vice versa, so that in a patent issued to a sole inventor the claims which would be void in a patent issued as a joint patent would be valid, although the other claims are void. We think that on this topic the rules of law which we have already stated could not be questioned, so that, unless Hunter was the originator of an inventive idea which was an essential part of the claims in issue, nothing which he might have contributed to any part of the patent could be of avail to the respondent on what we have described as the first defense set up under its amendment to its answer.

The important witness for the complainant, Rudolph M. Hunter, is supported by the probability which we have spoken of, that, as the complainant's solicitor, he would not commit the grievous fault with which he is charged by the respondent. Against this, the respondent says that Hunter might have assumed that what he did was within the usual privilege given to a solicitor in making amendments. This, at the most, is only a possibility, which, in view of Hunter's admitted clientage and reputation as a patent solicitor, is more an improbability than a probability. The crucial day in the case was January 7, 1895, on which day it is agreed Liddell was at Hunter's office for the purpose of signing and making oath to the application. Hunter testifies that on that day the changes which appear in the copy of the patent attached to this opinion, which we have already spoken of, were made, and a clean draft of the entire application was completed, and thereupon the oath taken by Liddell. There is no question that the oath was taken that day, and Hunter testified expressly that the application was then completed. On the other hand, Liddell, who was called by the respondent, testifies that his visit at the office was very hurried, that he did not read the specification and claims, but merely turned them over, and made oath to them, assuming that everything was right. The respondent computes, and proves, that it would have required two hours to have made a clean draft of the application. It also computes, but makes no proofs in reference thereto, that it would have required at least half an hour to have read the application in its new draft, and also urges, without proof, that Liddell is very slow in his methods, while Hunter is as quick as lightning, and that it would have taken a long time for Liddell to have suggested the amendments then made. It therefore computes that it would have been impossible to have trans-

acted at that interview all the complainant maintains to have been transacted.   On the other hand, as both Liddell and Hunter were each testifying from memory, without any visible thing cotemporaneous as of that particular day to support their recollection, either pro or con, the respondent's entire contention is purely inferential and problematical, and not supported by the kind of proof required by the authorities which we have cited with reference to issues of this character.   The record contains a letter written by Hunter between January 1st and January 4th, as shown by his letter book, in which he states to one Haverstick, who represented the predecessor in title of the complainant, that he inclosed the draft of the application for the patent, and observed that the draughtsman had had a hard time to unravel the details, and that some parts were still wanting, but that he (Hunter) had made some memoranda of the parts on which he needed information, which memoranda he had annexed to the inclosed specification.   Hunter thus made clear that, at least three or four days before January 7th, he had gone over the application and informed himself as to what amendments were needed.   It follows that he knew what they were, and probably had so far reflected on them that he could readily put them in form whenever he met Liddell.

The witnesses relied on by the respondent are Liddell and Drury. Each of these testify only from recollection, under the circumstances which we have explained.   We also find special grounds for questioning the recollection of each so far as this case is concerned.   Drury, for instance, testifies at first that, during the whole progress of completing the application, he never met Liddell to his recollection.   In answer to questions, he says at first: "I have no recollection of seeing Mr. Liddell at any time," and then he says, in reply to distinct questions, that he could not swear that he never saw him.   Subsequently he states that he had an impression that Mr. Hunter sent Mr. Liddell to his office with Liddell's working drawings.   "In fact," he adds, "I am pretty sure of having some interview with Mr. Liddell with the drawings."   The undoubted fact is that he saw Mr. Liddell twice, first on or about September 23d, and again on October 15th.   The second interview was as testified to by Rudolph M. Hunter, as fortified by the correspondence in the record.   Hunter wrote Liddell that Drury needed some explanations of the drawings, to which Liddell assented by letter.   This is supplemented by the statement by Hunter that Liddell came to Philadelphia, which was the place of residence of Hunter and Drury, on the Tuesday following October 12th, which was October 15th, for the purpose of meeting Drury, and did meet him.   The fact of this second meeting does not seem to be questioned, although we have given the entire substance of Drury's testimony in reference to his interviews with Liddell.

Drury testifies that he is not able to find any Liddell tracings or drawings, or written memoranda, or book entries in regard to the matters under discussion.   In reply to questions, he is unable to give any dates whatever, and fixes times only relatively, as we will show further hereafter.   He admits that, a little while previous to his testifying, at the summons of the respondent, he told the complainant's solicitor that, if he saw the drawings, he could identify them as being his work, but he

adds: "The circumstances under which the drawings were made, I do not recollect." Drury testifies that he had no dates; his precise language being, "I do not know any date." He nowhere makes any direct statement tending to show whether he did anything whatever after January 7, 1896, which is the crucial period. Being asked on cross-examination whether he is able to state the date when he had the crucial interview with Mr. Hunter as testified to by himself, and was "able to state the exact date," he replied: "I am not." Being also asked as follows: "Do you see on the blue print, or in connection with the sketches, or have you from any other source, reason to doubt that sworn testimony of Mr. Hunter," as to pencil marks on the blue print, he replied: "I have not." The following is even more important. He testified that all the information he received to enable him to indicate any changes he received from Hunter. This ignores entirely the interview with Liddell on October 15th. On redirect examination, he was asked to refresh his recollection and state whether Hunter made pencil sketches on the first blue print in the presence of the witness or in his absence. He replied: "My only recollection is, as I have said, taken from Mr. Hunter's method of giving me instructions—is that those pencil sketches were made while I was there, and he was telling me what changes to make on the drawing." This led to the following question and answer on cross-examination resumed: "Well, you have no positive recollection of seeing Mr. R. M. Hunter make those pencil marks on the first blue print, but you think it altogether likely he did make them in your presence. Is that about it?" He answered: "That's about it." Thereupon he was re-examined by the respondent, who called attention three times to the word "about," and asked him to frame his testimony "exactly to suit" himself on the question whether he was present or absent, "when Mr. Hunter made pencil sketches on the first blue print." He replied again even more positively as follows: "As I have said, it would be right in line with Mr. Hunter's practice and his method of instructing me to make those sketches on that blue print, so as to explain to me the changes that were necessary, and that were made on and shown in the second blue print." Thereupon the witness was dismissed without further examination by either party.

The theory of the respondent on this particular branch of this topic, which is essential to its case, is in substance as follows: Whereas Hunter testified that his pencil sketches were made in the presence of Liddell, Drury testified that Hunter made them in the presence of Drury. Even if Drury had undertaken to state that he had any personal recollection in the matter, the probability might be that Drury, having forgotten that Liddell came to him on October 15th and made certain explanations, assumed by mistake Liddell's second visit to him as having been made by Hunter, and, in like manner, he may well have carried forward Liddell's first sketch on manilla paper to the second interview, whether it was with Liddell or with Hunter, as to which he again refers to the same kind of paper. Certain it is, however, that on the proper rules of evidence, inasmuch as there was no further examination to overcome the inference which follows from what we have quoted from Drury's testimony, that it was in no part based on personal recollection, it should all be stricken out. As, therefore, the respondent

produced no other proofs to support its proposition in this particular, it necessarily falls to the ground. The examination which we have given of Drury's testimony shows that, as it was produced after so many years under the circumstances which we have explained, in would be of little value with regard to any issue whatever, and certainly it fails to be of that clear and convincing character which we have shown the rules of law require from this respondent.

As we have said, the only other witness relied on by the respondent is Liddell. His testimony impresses us as discursive and hazy, and not based on personal recollection in any important degree. Aside from the facts to which we have referred, that it was given after many years, that his mind had evidently been occupied in part with other analagous matters, so that there was peculiar liability to confusion of the memory, and that he had no occasion to charge himself with this particular matter, and evidently had not done so, it would be too burdensome for ourselves and for others if we should attempt to elaborate the reasons for our estimate of it. His testimony cannot be judged in the pointed way in which we have judged Drury's. To estimate it properly, we have been compelled, contrary to our custom, to read nearly the whole of it. We cannot photograph it to others in an opinion so that it may appear to them as it appears to us. On the whole, we need only say as to the respondent's witnesses that, for the issues we are now considering, we must look for support with reference to its amendment to the answer beyond its oral proofs.

Returning again to the first issue presented by this amendment—that is, the nature and extent of what the respondent claims that Rudolph M. Hunter contributed—we pass by, for the reasons we have stated, all mere mechanical details, and what relates only to the claims other than claims 1, 2, and 7. We think Drury properly puts the essence of what remains. He was able to do it, notwithstanding the condition of his personal recollection, because he was an experienced draughtsman, he had the patent before him, he was generally acquainted with the subject-matter, and was also assisted by the drawings relating to the patent in suit in their second and third stages. The sketch which represents the first stage has been lost. We shall return to it later. As put by Drury, the true issue on this part of the case is a claim that Hunter, on examining the movements shown in the first blue print, namely, that of eccentric gears, came to the conclusion that mechanism of that kind would be inoperative, for the reason that the gears produced rotary movements, and he saw that cams with intermittent movements would have to be substituted, and that thereupon Hunter developed the cam shown in the patent. The substance is briefly that Liddell gave the forming-plate an entire revolution, while Hunter invented and substituted for it the oscillating motion which is made an element in the claims. The Liddell invention first appeared in pencilled sketches brought by Liddell to Hunter's office, which sketches passed into Drury's hands for him to prepare with their aid suitable drawings, to be attached to the specification and claims to be prepared by Hunter. These sketches are not found. Without them, everything which might, with them, be called on to support the testimony of the witnesses pro and con is thrown into confusion, and without them no firm ground is

found beyond the patent itself. There are some probabilities, however, which are quite as much with the complainant as with the respondent. Liddell seems to be positive that these drawings, which we call the first stage in contradistinction from the blue prints, which we have called the second and third stages, showed only a rotary movement, but Drury's recollection is, and he is undoubtedly correct, that he was unable from those sketches to produce drawings showing an operative mechanism. Yet they showed the gears in lieu of the cam, as testified by him; and, if the drawings pointed out specifically a rotary movement, it is difficult to perceive wherein Drury, who also had the aid of Liddell's explanations on October 15th, should fail in finding operativeness. A lack of operativeness might arise from the combination of gears with the oscillating movement of the forming-plate, but not with the rotary movement. Hunter, however, had the same material for preparing the application—that is, the specification and claims—that Drury had for preparing the drawings, yet Hunter, whatever he had before him, drew the claims under consideration showing clearly an oscillating movement. The natural line would have been that Hunter developed some suggestion given him by Liddell, so that the probability is that his sketches, whatever else they contained, did contain the oscillating suggestion, although Hunter admits it cannot now be fully determined whether they did or not. He insists, however that the real invention was the same as that set out in the claims as he prepared the application. As Liddell admits the application and the claims exhibit oscillating movements so clearly that the court cannot perceive how he could have overlooked that fact at the time he took his oath, no matter how slight the examination which he gave the papers as drawn by Hunter.

But there is a further proposition which seems to be a difficult one for the respondent to overcome. From what follows it will be seen that we are of the opinion that the respondent, on its proposition that the application was redrawn by Hunter after the last interview between Hunter and Liddell, has not produced sufficient evidence of the kind required on issues of this character to overcome the prima facie effect of the granting of the patent in suit. Therefore we must assume, with regard to the particular proposition which we are considering, that the entire specification and claims were completed at that interview; and therefore, further, that whatever was done, whether it originated with Hunter or Liddell, was accepted and acquiesced in by the latter. Let us assume that the original sketches and everything suggested by Liddell prior to the interview of January 7th gave only a rotating forming-plate. Let us also assume that the oscillating forming-plate was then suggested by Hunter. Nevertheless, the statement in Liddell's specification, to the effect that the return movement of the forming-plate is unimportant, would be true. Hunter testified as follows: "I distinctly understood that it was immaterial whether the forming-plate was made to oscillate back and forth or to rotate completely around in a return movement." The forming-plate does duty only during its forward movement. When it has accomplished that movement, it has met the conception of the inventor, and the whole of it. What follows—that is, whether it returns to the point where it recommences its duty by completing the rotation or by oscillating—is

a mere question of convenience and no essential part of the invention, although, as the claims in issue are drawn under the circumstances so far as they appear on this record, the patentee probably barred himself from claiming that a forming-plate which does not oscillate would infringe. Therefore, on the extreme hypothesis in favor of the respondent, the case would stand as follows: Granted that Liddell came to Hunter with a forming-plate which performed the new function in the manner required by his conception, granted that the only method shown by Liddell of returning the forming-plate, after it had performed its duty, to the point of recommencing its duty, was by a rotary movement, granted that thereupon Hunter had suggested to Liddell that it was more convenient to oscillate than to complete the revolution, such a suggestion would not have interfered with the inventive conception, but would have shown only a method which, in the mechanical arts, would be merely an equivalent. Certainly, under those circumstances, it would not be pretended that Hunter was either a joint or a sole inventor, with reference to the fundamental conception shown in the claims in suit. The most that could be said was that he suggested an alternative movement, as to which it has not been shown to us that any inventive idea was involved therein. In conclusion, we need only say that no proposition brought to our attention by the respondent on this particular topic has been supported by it with such quality or quantity of proofs as to justify us in overthrowing on their account the patent in issue, so far as relates to claims 1, 2, and 7.

A brief statement of the method in which the respondent presents to us the other topic covered by its amendment to the answer, adding, in order to make the account complete, a few matters not questioned, would be as follows: September 16, 1895, Liddell brought to Hunter's office the sketches, which we have called stage one. Either at Hunter's office or from his office they got into the hands of Drury, who desired explanations from Liddell, which he obtained, as already stated, on October 15th. On October 28th Drury rendered Hunter his account for services in that case, and no trace is found by Drury or any one else of any subsequent account or charge. On or about the 3d of January Hunter, having received back from Drury the blue prints which he had evolved from Liddell's original sketches, drew the application for the patent and sent it to Haverstick, a representative of the complainant's predecessor in title, with a letter stating that the operative details had not all been accomplished, and that, nevertheless, he (Hunter) had written a specification, to which he had added that he had annexed a memorandum of the parts wanting. This specification was undoubtedly a part of the application for the patent, which he also wrote he inclosed in the letter. January 7th Liddell was at Hunter's office, and then, on the respondent's theory, Liddell made oath to the application in the form in which it stood prior to the amendments shown by the exhibit which we will attach to the opinion. The respondent further claims that after Liddell took the oath Hunter redrew the application, including claims and specification, and caused the drawings to be modified. The respondent produced Drury as a witness, whose testimony we have already

commented on. According to his testimony, his first drawing was made from a sketch given him (Drury) by Hunter's brother, and to the latter by Liddell. This was on manilla paper. Drury further testifies that, after he prepared his first drawing, known as blue print No. 1, the machine was declared by Rudolph M. Hunter as inoperative. He called him—that is, Drury—to his office, explaining to him the changes he thought necessary, and endeavored to make them clear by pencilled sketches on the blue print. Thereupon, as Drury further testifies, he asked Hunter for an operative drawing, which he subsequently brought to him, also on manilla paper. Drury makes the interval of time between the pencillings on blue print No. 1 and the operative drawing on the manilla paper brought him by Hunter to have been a matter of about two or three days, as we have already said. As already partially explained, the respondent's further proposition is that these interviews between Liddell and Drury were after January 7th.

We have shown to what extent, if any, this part of the respondent's case had support from anything beyond the testimony of Drury, and we have analyzed Drury's testimony, and shown that, so far as this case is concerned, it is not of the character which the law requires. There is no evidence or probability favoring the respondent's view on this topic the pith of which we have not stated. On the other hand, it is to be noted that Drury makes no attempt to claim that any of his interviews were after January 7th. All that the respondent has upon which to base the theory that they were are the alleged facts that the manilla paper was produced to Drury by Hunter two or three days after the interview between the two in which the pencillings were made on blue print No. 1, and that Hunter testifies that all those pencillings were made when Liddell was present, and that his last presence was on January 7th, so that, therefore, it necessarily follows that the production of the manilla paper by Hunter was two or three days after the date last named. It cannot well be doubted that whatever pencillings were made on blue print No. 1 were made by Hunter when Liddell and Hunter were present on January 7th; but, as already suggested, Drury had entirely forgotten Liddell's visit to him on October 15th, undoubtedly with blue print No. 1, and he might easily, after the long interval of time, innocently mistake an alleged interview with Hunter for the one with Liddell of October 15th, and also innocently have carried forward into the last interview the manilla paper which he saw when the matter was first brought to his attention. Therefore we think the respondent's case fails to show sufficiently any interviews between Hunter and Drury after January 7th.

On the other hand, Hunter testifies expressly that the work was completed on January 7th. He is supported by his ledger entries, to which we have referred, made under date of January 7th, containing a charge of $10 for "extra drawings laying out cams, Case A. expert," and a further charge for drawings for the same case. His other charges were the same which customarily carry through the whole work until the application is filed in the Patent Office, and they were made on September 23d. No later entry than January 7th is found

on Hunter's books, and, as we have said, none later than October 28th on Drury's books. The respondent undertakes explanations in reference to these entries, but they are purely hypothetical, and not supported by any facts brought out on the examination of witnesses. These entries indicate that presumptively everything was closed on the part of Drury on October 28th, and on the part of Hunter on January 7th.

However, we need not pursue the examination of this evidence further. Our general conclusion is that which we have already indicated, and we fail to be satisfied that anything material was done by Hunter in the absence of Liddell or without his approval. We must add, however, that a legal proposition lies squarely across this branch of the defense. We are unable to see any reason why any alleged infringer should be permitted collaterally to attack a patent on the basis of fraud in its procurement, especially fraud under the particular circumstances alleged here. Whether or not an oath shall be required from an inventor before a patent can issue to him, whether or not he may consent in advance that his solicitor shall take his conception and do whatever is necessary in addition thereto to secure a patent therefor, and whether or not a solicitor may contribute a substantial portion of the apparent invention and claim it at the Patent Office as his sole production, or one in which he jointly took part, or surrender it entirely to whomsoever may be cooperating with him, are, so far as alleged infringers are concerned, mere matters of regulation. Somebody is entitled to a patent for the invention, which, if issued in accordance with the regulations of the United States, no matter to whom, the infringer has no right to infringe. He is not deprived of anything that belongs to him by reason of lack of regulations, or by reason of the violation of the same, if they existed. We regard it as settled that this defense is not open to this infringer on any view of the facts. Rubber Company v. Goodyear, 9 Wall. 788, 797, 19 L. Ed. 566; Railroad Company v. Dubois, 12 Wall. 47, 63, 64; Mowry v. Whitney, 14 Wall. 434, 441, 20 L. Ed. 858.

This leaves only the question of Claussen's alleged priority. What has already appeared in this opinion ought to make it clear without further statement on our part that, under the rules of evidence to which we have referred, Liddell cannot be carried back further than January 7, 1896. Prior to that he was in what may be described as a preliminary condition of one who afterwards becomes an admitted inventor. We cannot undertake to phrase it by any other word than the general one "preliminary." We think that Claussen cannot, under the rules or evidence applicable hereto, find a date earlier than January 17, 1896, even if he could establish a date so early as that. As we understand the record, he was prior to that date substantially in the same preliminary condition that Liddell was prior to January 7th, except, however, that Liddell had one clear advantage over Claussen from September 23, 1895, six weeks earlier than Claussen first appears in the art in any form. From that date to January 7th, Liddell was constantly working towards the production of a patent, while there is nothing in the record to show that prior to January 17th, if so early as that, Claussen had any purpose whatever of bringing his conception, in whatever con-

dition it was, to a practical result. In fact, taking the case by and large, what the Circuit Court of Appeals for this circuit observed in connection with the quotation from Park's History of Medicine, in De-ceco Co. v. Gilchrist Co., 125 Fed. 293, 296, 60 C. C. A. 207, applies. Liddell was working towards a practical result, though, perhaps, slowly and intermittently, while, so far as the record shows, Claussen was only thinking and waiting.

The position of the complainant is that at no time prior to his examination of Liddell's patent, which was in May, 1896, did Claussen in any way conceive, or in any way represent, any operative combination like that in issue here. We have no occasion to establish so late a date as that named by the complainant. January 17th is enough for all the purposes of the case. Prior to January 17th Claussen had proceeded so far as to evolve three drawings. Claussen first testifies with reference to what is called Claussen's Exhibit No. 1, which is reproduced in the record under the form of Claussen Exhibit No. 2. This bears date of November 22, 1895. We will return to it again. He then testifies in regard to Claussen Exhibit No. 3, which is described on its face as a drawing started November 23, 1895, and finished January 17, 1896. After finishing his testimony based on supposed recollection refreshed by these drawings, and after he had been under examination at different dates from December 8, 1902, to January 5, 1903, the case was re-opened for this further examination on the motion of the respondent, which stated that the sketch known as Claussen Exhibit No. 5, reproduced in the record as Claussen Exhibit No. 6, had been overlooked.

The treatment of these various drawings, both in taking the proofs and before us, has been confused. This, perhaps, was a necessity of the case, arising out of the fact that they were intertwined without much regard to priority of dates in such a way that they devoured each other. Inasmuch as Claussen Exhibit No. 3 was not finished until January 17th, it bears, of course, on the question of priority only incidentally. Claussen Exhibit No. 1 was a mere sketch on a sheet of which the lower one-third contained two other figures, below which were written the words "4,000 stitches per minute. J. B. Merrow & Sons." Claussen wrote those. J. B. Merrow & Sons were manufacturing "crochetting machines and special machinery." Claussen worked from time to time on drawings for them, and, as he says, having a little leisure, he sketched that mechanical motion on the same sheet. He did not remember whether the latter or the sketch No. 1 was made first, but he presumed that it was not probable that he started at the bottom of the sheet. Nor has he shown that this sheet was ever exhibited to any other person, or that it was more than a tentative, a speculative drawing. In response to three different questions put him by the respondent, in connection with Claussen's Exhibit No. 1, in order to bring out something specific in its favor, he testifies that he did not remember what kind of a folding-bed he had in mind, whether it was a reciprocating one or a rotating one, that he did not remember what kind of a movement he intended for the folding-bed at the time he made that sketch, and, finally, as follows: "I don't really remember what kind of a bed I should have used at the time; for, if I had had any idea, I should have indicated it on the sketch."

The next sketch in the order of the respondent's proofs was Claussen Exhibit No. 3. This, as we have said, was started on November 23, 1895, and finished on January 17, 1896. Claussen says of it that exhibit No. 5, which will come later, bearing date November 6, 1895, was only a "free hand sketch," while No. 3 was "a drawing worked up a little bit more elaborate." The important facts, however, are that Claussen testifies that Exhibit No. 3 was made in the latter part of 1895 and in the early part of 1896, "not as a working drawing," but to "record" his invention of the rotating conveyer, with the oscillating carrier and an oscillating tucker-plate, so, as he says, that "the general character of that invention, so far as it had been developed, might be preserved." This is a striking admission that even Exhibit No. 3, which was completed January 17th, did not indicate that his invention had been fully developed. The more important feature of his testimony with reference to this exhibit is the following:

"Q. Who invented that combination of a rotating conveyer and an oscillating carrier pivoted to that conveyor, and oscillating toward and from the center of rotation of the conveyer?
"A. I did.
"Q. How early did you make that invention?
"A. Between November 23, 1895, and July 17, 1896."

Then being asked what paper evidence he had of the dates, he answered: "Claussen Exhibit No. 3." Being asked again by the respondent, for the purpose of getting a more specific date, when he invented the combination spoken of, he answered: "Three or four days before, or three or four days after, January 1, 1896." In this way the respondent endeavors to bring the invention of the combination spoken of as near as possible to January 7th, which we have shown to be the complainant's date. The only thing that can possibly be said about this, however, is, first, that the combination here spoken of by Claussen is, on the respondent's theory, the pith of his invention; and, second, that, on the settled rules of evidence we have stated, Claussen's testimony at this point fails to fix an earlier date than January 17th.

We are coming now directly to Claussen Exhibit No. 5, reproduced in the record as Claussen Exhibit No. 6. We refer again to the fact that Claussen first testified, before he saw Exhibit No. 5, that his invention was between November 23d and January 17th. We now call attention to the further fact that he also testified, before he saw Exhibit No. 5, that the tucker-plate vibrating on trunnions originated with him, and originated with him in the sketch of November 22, 1895, which was Exhibit No. 1. In other words, he thus positively makes November 22d the date of his conception of a vibrating tucker-plate. We should, in this connection, observe that he uses the word oscillating and the word vibrating as synonymous. In the course of his examination subsequent to the above testimony, and after Exhibit No. 5 was brought to his attention, various questions were put to him by the respondent which enabled him to reframe a very considerable portion of his testimony which we have cited. As we have said, nobody questions Claussen's integrity, and his modified testimony is probably nearer the absolute truth than that which he first gave. We are, however, able to get at the facts sufficiently for our purposes without re-

lying on his evidence. The only other general facts to which we need refer with regard to Exhibit No. 5 is that the respondent describes it as "a pencilled sketch," and, as we have seen, Claussen as "a free-hand sketch."

We are now able to take up all these sketches in the logical order. First in date, of course, is Claussen Exhibit No. 5, of November 6, 1895. The next historically is Exhibit No. 1, drawn in the manner we have seen in connection with work done for J. B. Merrow & Sons, and, so far as we can discover, begun and completed on November 22, 1895. The third is Exhibit No. 3, commenced on November 23, 1895, and completed January 17, 1896. The latter is the only one claimed by the respondent to approach completeness, or to have the semblance of a working drawing. As, however, we have found that Liddell's conception was complete earlier—that is, on January 7th—this Exhibit No. 3 necessarily goes out of the case on the issue of mere priority, and is useful only for illustration, in that Claussen testifies that the mechanisms shown by it are the same as those shown by the sketch of November 6th.

It is apparent throughout the record, and seems not to be questioned, that the pencilled sketch of November 6th made use of a Vee-plate in forming the diamond-fold. Inasmuch as there is nothing in the patent in suit or in the record to show that Liddell is limited to the Deering bag, we have no occasion to consider precisely the form of the diamond-fold made by the Vee-plate. The respondent says that the significance of Claussen Exhibit No. 1, of November 22d, is that it delineated "the idea of employing in a paper-bag machine, without any Vee-plate, a tucker-plate oscillating upon fixed trunnions," and so on. Stone, one of the respondent's witnesses, has made clear the distinction between a machine operating with a Vee-plate and one, like Liddell's, operating without a Vee-plate, and thus between Claussen's Exhibit No. 5 and the sketch of November 22, 1895, and this distinction we think renders it impossible to maintain that in the sketch of November 6th Claussen had any clear conception, or, indeed, any conception whatever, of what is described in the claims in suit as a "forming-plate," noting that the word "forming-plate," both inherently and in connection with the specification of the Liddell patent, means something very much more than the tucker-plate described by Claussen in the sketch of November 6th. Stone's illustrated diagram, in connection with his testimony, is exceedingly clear. He does not directly illustrate Claussen Exhibit No. 5, of November 6th, but the Claussen Exhibit No. 3, of January 17, 1896, the mechanisms of each of which, as we have already stated, are said by Claussen to be the same, always, of course, with the qualification that the November 6th drawing is a free-hand sketch, while that of January 17th approaches nearly to a working drawing, if not fully so.

The function of the tucker-plate in the drawing of January 17th is described by Claussen in the following language: "The tucker-plate, P, swings on its trunnions; its free edge defining the main transverse fold of the bag blank." He gives it no other function than this, and his drawings show that it can have no other. He further illustrates the respondent's Claussen patent, and also the respondent's machine.

He described their tucker-plate as provided with two opposite disposed side nippers," which side nippers, he adds, "are provided with suitable mechanism, not shown, to open and close them at proper times." The origin of these side nippers he attributes to the Claussen Exhibit No. 1, dated November 22, 1895. Here he shows no Vee-plate. With reference to his illustrations of Claussen Exhibit No. 5, he claims for the tucker-plate only that its free edge defines the main transverse fold of the bag blank, while, for the other mechanisms, he says that, when the tucker-plate has continued its revolution nearly 90 degrees, it has folded the open end of the bag blank into a diamond form. The difference in formation function between the so-called tucker-plate devised November 6th and the tucker-plate claimed to have been exhibited by the drawing of November 22d, as thus found by Stone in the respondent's machine and the respondent's patent, is so broad that we need not comment on it, except to say that in the latter the so-called tucker-plate does apparently all the duty of the complicated combination of the tucker-plate, the Vee-plate, and the other details, of the sketch of November 6th, the numerous parts of which can be understood from what we have said, but are better illustrated by Mr. Stone's drawings to which we have referred. Here, certainly, is no such equivalency as would deprive the complainant of its simple but ingenious invention, all the more ingenious because simple, shown in his patent and adopted in the respondent's mechanism, as against the complicated device of November 6th. All the details of the sketch of November 6th, when operating together, may have produced the same result as the Liddell simple forming-plate, but neither separately nor together do they represent Liddell's conception. On the other hand, Stone seems to us to have made clear the essential distinction between the two, which is that Liddell had what he truly describes as a forming-plate, while Claussen suggested only a tucker-plate.

Thus we have disposed of Claussen Exhibit No. 5 and Claussen Exhibit No. 3. This leaves only Claussen Exhibit No. 1. This, we think, exhibited the same conception of a forming-plate which Liddell had; but, as we have already seen, it failed to show a combination thereof with the cylindrical movement called for by the claims in issue. Moreover, the sketch is shown to have been fragmentary and in pencil. It had no working parts, and nothing more was ever heard of it, except as it became merged in the revival of Claussen's general conception which took place in 1896, at a date which, as we have shown, cannot be fixed by the evidence, under the rule which guides us, at any time prior to January 17th. What then occurred is justly described in words which imply a development. The respondent puts it:

"What Mr. Claussen did in 1896 with the mechanism of Claussen Exhibit No. 5 was to take the Vee-plate, and also the tucker-plate, from that mechanism, and surround them with a new environment, and develop them into the machine of the Claussen Vee-plate patent, No. 574,020, and to contemporaneously develop the other parts of the mechanism of Claussen Exhibit No. 5, together with its tucker-plate, into the Claussen patent, No. 598,497."

The latter patent is the one according to which the respondent's machine was built. The period of this final development began apparent-

ly in February, 1896, and ended with the filing of Claussen's application on July 20, 1896, being, as we have shown, nearly six months after Liddell's application was filed, and four months after Liddell's patent issued, and nearly seven months after January 7th, when Liddell's conception had been fully put in form in the application drawn by Hunter. Claussen says that, after looking the Liddell patent over, he concluded that he had a far better machine than Liddell, and he proceeded to finish the drawings which he began about the 1st of February, so that from November 22, 1895, until February, 1896, Claussen Exhibit No. 1 was never heard of so far as this record goes, and was never heard of in a definite form until Claussen's application was filed on July 29, 1896.

Not only, therefore, did it fail to show the combination of the claims in issue, because Claussen's testimony which we have already cited distinctly strikes out the cylinder, but it remained so long in a fragmentary, pencilled, and quiescent condition that, so far from meeting the burden of proof which we have shown rests on the respondent on this question of priority, the case as a whole tends to lead the court to believe that Claussen, soon after he sketched his Exhibit No. 1, ceased to have any interest therein. In other words, the mind of the court leans towards the proposition that Exhibit No. 1 was a purely tentative sketch, which was given no definite form until several months after the Liddell application was filed.

In addition to all the foregoing, the case has the very common aspect of one wherein two different inventive minds were working almost contemporaneously on the same conception, one of whom put it into definite form, so as to apply successfully for a patent thereon, before the other succeeded in accomplishing any complete result. In this way Liddell gained the position which we have already referred to, as described in Dececo Company v. Gilchrist Company, 125 Fed. 293, 60 C. C. A. 207. The law applicable under such circumstances has been often laid down, and always with a result favorable to the complainant in this litigation. It has never been better stated than by Judge Sprague in Johnson v. Root, 1 Fish. Pat. Cas. 351, Fed. Cas. No. 7,411, 2 Cliff. 637. Although this was a mere charge to a jury, it was incorporated by Mr. George T. Curtis into his authoritative work on Patents (4th Ed.), at page 333 and sequence. There the rule was stated under circumstances where it worked against the patentee, to the effect that if the patentee had not perfected his invention, and did not use due diligence to carry it into effect, and in the meantime some one else had invented, and incorporated into a practical, useful machine, the same invention, the patentee could not by a subsequent patent appropriate to himself what was embraced in the former machine, even though the patentee had previously filed a caveat. This ruling was affirmed on a motion for a new trial in the same case by Mr. Justice Clifford in 2 Cliff. 108, Fed. Cas. No. 7, 409.

The application of this principle in behalf of a patentee is even more marked, as explained in Walker on Patents (4th Ed. 1904), at page 66, where the learned author gives the reason for allowing, as he says, a patented invention to date back to a written description, or to a drawing, or a model, as the case may be, while an unpatented invention,

which is set up to negative the novelty of a patented invention, is not allowed to date back to either of those things. The law as applied to the circumstances of this case is laid down very positively in Coffin v. Ogden, 18 Wall. 120, 124, 21 L. Ed. 890. That opinion says on this topic: "The law requires, not conjecture, but certainty. If the question relates to a machine, the conception must have been clothed in substantial forms which demonstrate at once its practical efficacy and utility." In conclusion on this topic, prior to January 7, 1896, Liddell's conceptions were, from day to day, at least as fully developed as Claussen's; and, as he first secured his patent, the authorities give him priority.

The impressions which we had at the close of the trial of this case are substantially the same as the conclusions herein expressed. Nevertheless, as we fully understand the difficulties in the way of obtaining, in the light of the state of the art as it was nearly a third of a generation ago, a true perspective of novel and complicated mechanism which was not put into practical use at or near the time of its origin, we have carefully re-examined the record and briefs. On the whole, the result is that we are of the opinion that the record discloses nothing to meet the presumption of patentable invention with reference to claims 1, 2, and 7 of the patent in suit, and that the complainant has sustained the burden required on the issue of infringement. We are also of the opinion that the respondent has not sustained any of its special defenses according to the rules of evidence we have explained. Therefore on this record we must find for the complainant.

Ordered that there be an interlocutory decree in accordance with rule 21 for an injunction and a master on claims 1, 2, and 7.